# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

SOUTHERN UTAH WILDERNESS
ALLIANCE, a Utah non-profit
corporation, et al.,

      Plaintiffs-Appellees,

v.

BUREAU OF LAND
MANAGEMENT,

      Defendant-Appellee,

TYLER LEWIS, in his official
capacity as San Juan County
Commissioner, et al.,

      Defendants-Appellants,

and

NORMAN CARROLL, et al.,

      Defendants.

_____

NATURAL RESOURCES DEFENSE
COUNCIL, et al.,

      Amici Curiae.

04-4071 & 04-4073

ORDER

Filed January 6, 2006

Before **HENRY**, **HARTZ**, and **McCONNELL**, Circuit Judges.

These matters are before the court on the petition for rehearing filed on behalf of Garfield and Kane Counties. Upon consideration of the petition, and the responses filed by other parties and amici, we have determined to amend the original panel opinion on page 86, to include the following sentence:

> This case does not raise the question, and we do not decide, whether a road officially laid out or erected for public use by state or local governmental authority prior to repeal of R.S. 2477 would qualify as a highway without proof of ten years' continuous public use. *See* Utah Code Ann. Sec. 72-1-102(7) (West 2004).

A copy of the amended opinion is attached to this order. It shall be substituted for the original. The petition for panel rehearing is otherwise denied in all respects.

Entered for the Court

by:

Elisabeth A. Shumaker
Clerk of Court

2

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 8, 2005**

**PATRICK FISHER,**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SOUTHERN UTAH WILDERNESS
ALLIANCE, a Utah non-profit
corporation, and SIERRA CLUB, a
non-profit corporation,

        Plaintiffs-Appellees,

    v.

BUREAU OF LAND
MANAGEMENT,

        Defendant-Appellee,

    and

SAN JUAN COUNTY, Utah; TYLER
LEWIS, in his official capacity as San
Juan County Commissioner; KANE
COUNTY, Utah; and GARFIELD
COUNTY, Utah,

        Defendants-Appellants.

--------------------------------

NORMAN CARROLL, in his
official capacity as Kane County
Commissioner; JOE JUDD, in
his official capacity as Kane County
Commissioner; STEPHEN CROSBY,
in his official capacity as Kane County
Commissioner; LOUISE LISTON, in
her official capacity as Garfield
County Commissioner; D. MALOY

Nos. 04-4071 & 04-4073

DODDS, in his official capacity as Garfield County Commissioner; CLARE M. RAMSAY, in her official capacity as Garfield County Commissioner,

Defendants.

NATURAL RESOURCES DEFENSE COUNCIL, NATIONAL PARKS CONSERVATION ASSOCIATION; THE WILDERNESS SOCIETY; ALASKA CENTER FOR THE ENVIRONMENT; ALASKA WILDERNESS LEAGUE; ARIZONA WILDERNESS COALITION; CALIFORNIA WILDERNESS COALITION; COLORADO ENVIRONMENTAL COALITION; COLORADO MOUNTAIN CLUB; GRAND CANYON TRUST; GREATER YELLOWSTONE COALITION; IDAHO CONSERVATION LEAGUE; NATIONAL WILDLIFE FEDERATION; NATIONAL WILDLIFE REFUGE ASSOCIATION; NEW MEXICO WILDERNESS ALLIANCE; NORTHERN ALASKA ENVIRONMENTAL CENTER; SAN JUAN CITIZENS COALITION; SOUTHEAST ALASKA CONSERVATION COUNCIL; WYOMING OUTDOOR COUNCIL; PROPERTY OWNERS FOR SENSIBLE ROADS POLICY; JANA SMITH; RON SMITH; STATES OF UTAH, IDAHO, and WYOMING,

2

Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:96-CV-836-TC)**

Shawn T. Welch (Robert S. Thompson, III, with him on the briefs), Pruitt Gushee, Salt Lake City, Utah, for Defendants-Appellants San Juan County and San Juan County Commissioner Tyler Lewis.

Ralph L. Finlayson, Assistant Attorney General (Mark L. Shurtleff, Attorney General, with him on the briefs), Salt Lake City, Utah, for Defendants-Appellants Kane and Garfield Counties.

Jerome L. Epstein, Jenner & Block LLP, Washington, D.C. (Heidi J. McIntosh, Southern Utah Wilderness Alliance, Salt Lake City, Utah, Edward B. Zukoski, Earthjustice, Denver, Colorado, and William H. Hohengarten, Jenner & Block LLP, Washington, D.C., with him on the brief), for Plaintiffs-Appellees Southern Utah Wilderness Alliance and Sierra Club.

Todd S. Aagaard, Attorney, Appellate Section, Environment & Natural Resources Division, Department of Justice, Washington, D.C. (Thomas L. Sansonetti, Assistant Attorney General, M. Alice Thurston, Attorney, Appellate Section, Environment & Natural Resources Division, Department of Justice, Washington, D.C., Paul M. Warner, United States Attorney, Salt Lake City, Utah, and Daniel D. Price, Assistant United States Attorney, Salt Lake City, Utah, with him on the brief), for Defendant-Appellee Bureau of Land Management.

Mark L. Shurtleff, Utah Attorney General, and J. Mark Ward, Assistant Attorney General, Salt Lake City, Utah; Steven W. Strack, Deputy Idaho Attorney General, Boise, Idaho; and Patrick J. Crank, Wyoming Attorney General, Cheyenne, Wyoming, filed an amici curiae brief for the states of Utah, Idaho, and Wyoming, in support of Appellants San Juan, Kane, and Garfield Counties.

Michael S. Freeman, Faegre & Benson LLP, Denver, Colorado, filed an amici curiae brief for Property Owners for Sensible Roads Policy and Jana and Ron Smith, in support of Appellees Southern Utah Wilderness Alliance, Sierra Club,

3

and the Bureau of Land Management.

Rebecca L. Bernard, Trustees for Alaska, Anchorage, Alaska, and Louis R. Cohen, James R. Wrathall, and Brian M. Boynton, Wilmer, Cutler, Pickering, Hale & Dorn LLP, Washington, D.C., filed an amici curiae brief for Natural Resources Defense Council, National Parks Conservation Association, The Wilderness Society, Alaska Center for the Environment, Alaska Wilderness League, Arizona Wilderness Coalition, California Wilderness Coalition, Colorado Environmental Coalition, Colorado Mountain Club, Grand Canyon Trust, Greater Yellowstone Coalition, Idaho Conservation League, National Wildlife Federation, National Wildlife Refugee Association, New Mexico Wilderness Alliance, Northern Alaska Environmental Center, San Juan Citizens Coalition, Southeast Alaska Conservation Council, and Wyoming Outdoor Council, in support of Plaintiff-Appellees.

Before **HENRY**, **HARTZ**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

This case involves one of the more contentious land use issues in the West: the legal status of claims by local governments to rights of way for the construction of highways across federal lands managed by the Bureau of Land Management (BLM). In 1866, Congress passed an open-ended grant of "the right of way for the construction of highways over public lands, not reserved for public uses." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, *codified at* 43 U.S.C. § 932, *repealed by* Federal Land Policy Management Act of 1976 (FLPMA), Pub.L. No. 94-579 § 706(a), 90 Stat. 2743. This statute, commonly called "R.S. 2477," remained in effect for 110 years, and most of the transportation routes of

4

the West were established under its authority. During that time congressional policy promoted the development of the unreserved public lands and their passage into private productive hands; R.S. 2477 rights of way were an integral part of the congressional pro-development lands policy.

In 1976, however, Congress abandoned its prior approach to public lands and instituted a preference for retention of the lands in federal ownership, with an increased emphasis on conservation and preservation. *See* FLPMA, 43 U.S.C. § 1701 *et seq.* As part of that statutory sea change, Congress repealed R.S. 2477. There could be no new R.S. 2477 rights of way after 1976. But even as Congress repealed R.S. 2477, it specified that any "valid" R.S. 2477 rights of way "existing on the date of approval of this Act" (October 21, 1976) would continue in effect. Pub. L. No. 94-579 § 701(a), 90 Stat. 2743, 2786 (1976). The statute thus had the effect of "freezing" R.S. 2477 rights as they were in 1976. *Sierra Club v. Hodel*, 848 F.2d 1068, 1081 (10th Cir. 1988), *overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970, 971 (10th Cir. 1992) (en banc).

The difficulty is in knowing what that means. Unlike any other federal land statute of which we are aware, the establishment of R.S. 2477 rights of way required no administrative formalities: no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the

5

part of the states or localities in whom the right was vested. As the Supreme Court of Utah noted 75 years ago, R.S. 2477 "'was a standing offer of a free right of way over the public domain,'" and the grant may be accepted "without formal action by public authorities." *Lindsay Land & Live Stock Co. v. Churnos*, 285 P. 646, 648 (Utah 1929), (quoting *Streeter v. Stalnaker*, 85 N.W. 47, 48 (Neb. 1901)). In its *Report to Congress on R.S. 2477: The History and Management of R.S. 2477 Rights-of-Way Claims on Federal and Other Lands* 1 (June 1993), the Department of the Interior explained that R.S. 2477 highways "were constructed without any approval from the federal government and with no documentation of the public land records, so there are few official records documenting the right-of-way or indicating that a highway was constructed on federal land under this authority."

To make matters more difficult, parties rarely had an incentive to raise or resolve potential R.S. 2477 issues while the statute was in effect, unless the underlying land had been patented to a private party. If someone wished to traverse unappropriated public land, he could do so, with or without an R.S. 2477 right of way, and given the federal government's pre-1976 policy of opening and developing the public lands, federal land managers generally had no reason to question use of the land for travel. Roads were deemed a good thing. Typical was the comment by the great nineteenth-century Michigan jurist, Thomas

6

Cooley, that "[s]uch roads facilitate the settlement of the country, and benefit the neighborhood, and in both particulars they further a general policy of the federal government. But they also tend to increase the value of the public lands, and for this reason are favored." *Flint & P.M. Ry. Co. v. Gordon*, 2 N.W. 648, 653 (Mich. 1879). Thus, all pre-1976 litigated cases involving contested R.S. 2477 claims (and there are dozens) were between private landowners who had obtained title to previously-public land and would-be road users who defended the right to cross private land on what they alleged to be R.S. 2477 rights of way.

Now that federal land policy has shifted to retention and conservation, public roads and rights of way in remote areas appear in a different light. Some roads and other rights of way are undoubtedly necessary, but private landowners express the fear that expansive R.S. 2477 definitions will undermine their private property rights by allowing strangers to drive vehicles across their ranches and homesteads. Conservationists and federal land managers worry that vehicle use in inappropriate locations can permanently scar the land, destroy solitude, impair wilderness, endanger archeological and natural features, and generally make it difficult or impossible for land managers to carry out their statutory duties to protect the lands from "unnecessary or undue degradation." FLPMA § 302(b), 43 U.S.C. § 1732(b). They argue that too loose an interpretation of R.S. 2477 will conjure into existence rights of way where none existed before, turning every

path, vehicle track, or dry wash in southern Utah into a potential route for cars, jeeps, or off-road vehicles. For their part, the Counties assert that R.S. 2477 rights of way are "major components of the transportation systems of western states," and express the fear that federal land managers and conservationists are attempting to redefine those rights out of existence, with serious "financial and other impacts" on the people of Utah. Kane and Garfield County (K&G C.) Rep. Br. 21. Thus, the definition of R.S. 2477 rights of way across federal land, which used to be a non-issue, has become a flash point, and litigants are driven to the historical archives for documentation of matters no one had reason to document at the time.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In September and October of 1996, road crews employed by San Juan, Kane, and Garfield Counties entered public lands managed by the BLM and graded sixteen roads (or "primitive trails," as the BLM calls them) located in southern Utah. The Counties did not notify the BLM in advance, or obtain permission to conduct their road grading activities. With a few possible exceptions, none of these roads had previously been graded by the Counties, though some of them showed signs of previous construction or maintenance activity. The roads are claimed by the Counties as rights of way under R.S. 2477; some of them are listed on County maps as Class B or Class D highways. Six of

8

the routes lie within wilderness study areas. Nine are within the Grand Staircase-Escalante National Monument. Six others traverse a mesa overlooking the entrance corridor to the Needles District of Canyonlands National Park. According to the Complaint filed by a consortium of environmental organizations including the Southern Utah Wilderness Alliance (hereinafter collectively referred to as "SUWA"), the areas affected by the Counties' road grading activities "contain stunning red-rock canyon formations, pristine wilderness areas, important cultural and archeological sits [sic], undisturbed wildlife habitat, and significant opportunities for hiking, backpacking and nature study in an area largely undisturbed by road or human . . . development."

SUWA protested to the BLM, but these initial protests resulted in no apparent action against the road grading actions of the Counties. In October of 1996, SUWA filed suit against the BLM, San Juan County, and later Kane and Garfield Counties, alleging that the Counties had engaged in unlawful road construction activities and that the BLM had violated its duties under FLPMA, 43 U.S.C. § 1701 *et seq.*, the Antiquities Act, 16 U.S.C. § 431 *et seq.*, and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, by not taking action. The complaint sought declaratory and injunctive relief requiring the BLM to halt the Counties' construction activities and enjoining the Counties from further road construction or maintenance without the BLM's permission. The

9

BLM filed cross-claims against the Counties, alleging that their road construction activities constituted trespass and degradation of federal property in violation of FLPMA. In addition to declaratory and injunctive relief, the BLM sought damages to cover the cost of rehabilitating the affected areas.

The Counties defended on the ground that their road improvement activities were lawful because the activities took place within valid R.S. 2477 rights of way. The district court acknowledged that "the validity and scope of the claimed rights-of-way [were the] key to resolving the trespass claims," Memorandum Decision of May 11, 1998 at 3, but it also concluded that binding Tenth Circuit precedent required that "the initial determination of whether activity falls within an established right-of-way . . . be made by the BLM and not the court." *Id.* at 3 (quoting *Hodel*, 848 F.2d at 1084) (internal quotation marks omitted). It therefore stayed the litigation and referred the issue of the validity and scope of the claimed rights of way to the BLM. Although the Counties requested a ruling on "how the 'findings' of the [BLM] [would] be utilized" and "the weight [the] court may give such findings," the district court declined, stating that the weight it would give the BLM's findings was "not presently at issue." Memorandum Decision of August 6, 1998, at 2-3.

The BLM then conducted a thorough informal adjudication of the Counties' purported rights of way. It first issued an instructional memorandum describing

the process it would use to determine the validity and scope of the Counties' asserted rights of way. The memorandum included a general description of the evidence the BLM was seeking: evidence that the subject lands "were withdrawn, reserved or otherwise unavailable pursuant to R.S. 2477," evidence of "construction" (undefined), and evidence that the claimed right of way was a "highway" (defined as "a thoroughfare used . . . by the public for the passage of vehicles carrying people or goods from place to place"). The BLM then sent letters to the Counties, requesting that they "provide . . . any and all information or evidence (i.e., documents, maps, etc.) believed to be relevant to the validity or scope of the R.S. 2477 claims." It also published public notices seeking "any information believed to be relevant" to the Counties' R.S. 2477 claims.

The BLM then reviewed a variety of documents, including U.S. and county public land records and surveys, maps and aerial photography, wilderness inventory records, and BLM planning, grazing and maintenance records. It also conducted field investigations of each disputed route with representatives of the Counties and SUWA. In April of 1999, the BLM issued draft determinations for review and comment, and in July of 1999 and January of 2000, it issued final administrative determinations, concluding that the Counties lacked a valid right of way for fifteen of the sixteen claims, and that Kane County had exceeded the scope of its right of way in the sixteenth claim, the Skutumpah Road.

11

SUWA then filed a motion for summary judgment in the district court seeking enforcement of the BLM's administrative determinations. In response, the Counties sought to introduce evidence in addition to that contained in the administrative record, arguing that the district court should treat the BLM's determinations merely as discovery evidence on de novo review. The district court disagreed. It stated that "[r]eviews of agency action in the district courts must be processed *as appeals*," and therefore characterized SUWA's motion not as a request for summary judgment but as an appeal of informal agency adjudication. *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 147 F.Supp.2d 1130, 1135 (D. Utah 2001) (emphasis in original) (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994)). Accordingly, the court limited its review to the administrative record and applied the arbitrary and capricious standard of review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), as construed by this Court in *Olenhouse*. *Id.* at 1134-36.

The district court affirmed the BLM's determinations in their entirety, concluding that the BLM's factual determinations were supported by substantial evidence in the record and that its interpretation of R.S. 2477 was persuasive under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *Id.* at 1137. The Counties appealed, and we dismissed their initial appeal for lack of jurisdiction,

*Southern Utah Wilderness Alliance v. Bureau of Land Management*, 69 Fed.Appx. 927, 929-31 (10th Cir. 2003), concluding that the district court's order was not final because it did not rule on the parties' requests for injunctive relief and damages. On remand, the district court entered a final order granting the requests of SUWA and the BLM for declaratory judgment and denying all other requests for relief. Order of February 23, 2004 at 1-19. The Counties again appeal.

## II.     JURISDICTION AND STANDING

This Court has jurisdiction under 28 U.S.C. § 1291. The district court's order of February 23, 2004 constituted a final judgment, resolving all issues outstanding in the case.

San Juan County argues that SUWA lacks standing to challenge the Counties' purported rights of way. We need not address this issue, however, because the BLM, which does have standing, has raised the same claims and sought the same relief as SUWA, both here and before the district court. A decision on SUWA's standing, therefore, would in no way avoid resolution of the relevant issues. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984); *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 44-45 (1974).

## III.    TRESPASS CLAIMS AGAINST THE COUNTIES

In its final order of February 23, 2004, the district court granted SUWA's request for a declaration that:

i.   the Counties do not have R.S. 2477 rights-of-way on fifteen of the sixteen routes at issue in the court's June 25, 2001 Order (that is, all routes except for the Skutumpah route in Kane County); and

ii.  Kane County's construction work and/or proposed construction work on the Skutumpah route exceeded the scope of that right-of-way.

Order of February 23, 2004 at 17. It also granted the BLM's request for a declaration that:

i.   the Counties' actions at issue in this case did not fall within any established right-of-way and were not authorized by the BLM; and

ii.  the Counties' actions at issue in this case, on public land managed by the BLM without the BLM's authorization, violated FLPMA and constituted "unauthorized use" trespass under applicable federal regulations.

*Id.* at 18. These orders may be summarized as (1) a declaratory judgment that the Counties do not have R.S. 2477 rights of way on fifteen of the roads and exceeded the scope of the right of way on the Skutumpah road; and (2) a declaratory judgment that the Counties' action in grading the roads constituted trespass. We turn first to the trespass issue and then to the issue of the validity and scope of the Counties' R.S. 2477 claims.

The BLM contends, as it did below, that the Counties' actions in grading and realigning the roads in question without prior notice to or authorization from the BLM constituted trespass, whether or not the Counties have a valid R.S. 2477 right of way on those routes. Under BLM regulations in effect at the time of the alleged trespass, any use of federal lands that requires a right of way or other

14

authorization and "that has not been so authorized, or that is beyond the scope and specific limitations of such an authorization, or that causes unnecessary or undue degradation, is prohibited and shall constitute a trespass." 43 C.F.R. § 2801.3(a) (2004) (deleted April 22, 2005).[1] The BLM contends that the Counties' actions went beyond prior levels of maintenance, exceeded the authorized scope of prior rights of way (if any), and were performed unilaterally without consultation with federal land managers, and therefore that the Counties' actions constituted trespass even on the heuristic assumption that they own a valid right of way.

The district court rejected the BLM's argument. According to the court, "[A]s long as [the] County stays within its right-of-way, the scope of which is to be defined using Utah law, BLM authorization is not required." Memorandum Decision of October 8, 1997 at 19, Aplt. App. Vol. 1 at 136. *See also* Memorandum Decision of May 11, 1998 at 2-3, Aplt. App. Vol. 1 at 228-29 ("The United States originally argued that the road work activities of the Counties were unauthorized, whether or not the Counties held R.S. 2477 rights-of-way over the land in question. That premise has been rejected by the court. The court's view is that the validity and scope of the claimed rights-of-way are key to resolving the

---

[1] A revised version of this regulation appears at 43 C.F.R. § 2808.10(a)–(b) (2005). The only material difference between this regulation and the deleted one is that the revised regulation gives the BLM explicit authority to consider impacts on land outside the area of activity to determine if "unnecessary or undue degradation" is taking place. *See* 43 C.F.R. § 2808.10(b) (2005).

trespass claims asserted by the United States."). We, however, agree with the

BLM, at least in part, and conclude that the holder of an R.S. 2477 right of way

across federal land must consult with the appropriate federal land management

agency before it undertakes any improvements to an R.S. 2477 right of way

beyond routine maintenance. We remand this issue to the district court to

determine whether the work performed on the routes in this case went beyond

routine maintenance and thus constituted trespass.[2]

The trespass claim presents an issue of "scope," which was litigated in this

Court in *Sierra Club v. Hodel*, 848 F.2d 1068 (10th Cir. 1988). In *Hodel*, the

issue was whether Garfield County could convert a one-lane dirt road on an

established R.S. 2477 right of way into a two-lane gravel (later paved) road.

Applying a state law definition of the scope of the right of way, the Court held

that improvements on a valid R.S. 2477 right of way are limited to those

---

[2]San Juan County argues that the BLM waived this argument because the district court ruled against it below and the BLM did not cross appeal. However, the BLM has raised this issue as an alternative ground for affirming the district court's trespass holding. BLM Br. 22 ("[T]he district court need not have decided the validity of the Counties' asserted R.S. 2477 rights-of-way in order to determine that the Counties' construction activities constituted a trespass . . . . BLM's authority to regulate the use of R.S. 2477 rights-of-way provides an alternate ground for affirming the trespass finding."). "[A]n appellee 'may defend the judgment won below on any ground supported by the record without filing a cross-appeal.'" *Tinkler v. United States ex rel. FAA*, 982 F.2d 1456, 1461 n.4 (10th Cir. 1992) (quoting *In re Robinson,* 921 F.2d 252, 253 (10th Cir. 1990)). We therefore consider the argument.

"'reasonable and necessary for the type of use to which the road has been put.'" *Hodel*, 848 F.2d at 1083 (quoting *Sierra Club v. Hodel*, 675 F.Supp. 594, 606 (D. Utah 1987) (citing *Lindsay Land & Live Stock Co. v. Churnos*, 285 P. 646, 649 (Utah 1929))). Relying on *Nielson v. Sandberg*, 141 P.2d 696, 701 (Utah 1943), for the proposition that "an easement is limited to the original use for which it was acquired," *Hodel*, 848 F.2d at 1083, the Court held that "the correct 'reasonable and necessary' definition fixed as of October 21, 1976." *Id.* at 1084. In other words, the scope of an R.S. 2477 right of way is limited by the established usage of the route as of the date of repeal of the statute. That did not mean, however, that the road had to be maintained in precisely the same condition it was in on October 21, 1976; rather, it could be improved "as necessary to meet the exigencies of increased travel," so long as this was done "in the light of traditional uses to which the right-of-way was put" as of repeal of the statute in 1976. *Id.* at 1083.

The *Hodel* court also noted that "Utah adheres to the general rule that the owners of the dominant and servient estates 'must exercise [their] rights so as not unreasonably to interfere with the other.'" *Id*. (quoting *Big Cottonwood Tanner Ditch Co. v. Moyle*, 174 P.2d 148, 158 (Utah 1946)). This requires a system of coordination between the holder of the easement and the owner of the land through which it passes. The Court thus concluded that the BLM needed to make

17

an "initial determination" regarding the reasonableness and necessity of any proposed improvements beyond mere maintenance of the previous condition of the road. *Id.* at 1084-85.

This approach was elaborated and applied in district court cases after *Hodel*. In *United States v. Garfield County*, 122 F. Supp.2d 1201 (D. Utah 2000), the court held, with reference to the same road at issue in *Hodel*, that any road construction within the National Park, beyond "maintenance," would require advance notification of the Park Service and mutual accommodation between the Park Service and the County. *Id.* at 1246. In *United States v. Emery County*, No. 92-C-1069S, ¶ 6 (D. Utah, consent decree entered Dec. 15, 1992), litigation between a Utah county and the BLM was resolved by entry of a consent decree providing for advance notice to the BLM of any improvements beyond routine maintenance "so that both the County and the BLM may be satisfied that the proposed work on the R.S. 2477 highway is reasonable and necessary and that no unnecessary or undue degradation to the public lands would occur thereby." These decisions are consistent with holdings of circuit courts that changes in roads on R.S. 2477 rights of way across federal lands are subject to regulation by the relevant federal land management agencies. *See Clouser v. Espy*, 42 F.3d 1522, 1538 (9th Cir. 1994) (holding that "regardless whether the trails in question are public highways under R.S.[] 2477, they are nonetheless subject to the Forest

18

Service regulations"); *United States v. Vogler*, 859 F.2d 638, 642 (9th Cir. 1988) (holding that proposed improvements to an R.S. 2477 route in a National Preserve is subject to regulation by the National Park Service); *see also United States v. Jenks*, 22 F.3d 1513, 1518 (10th Cir. 1994) (holding that the owner of a patent or common law easement across national forest lands had to apply for a special use permit).

Relying on *Hodel* as well as common law principles governing easements, the *Garfield County* court stated, "Where rights-of-way and easements are concerned, one party cannot serve as the sole judge of scope and extent, or as the sole arbiter of what is 'reasonable and necessary.'" 122 F. Supp.2d at 1242. "And 'ordinarily . . . no material changes can be made by either party without the other's consent . . . .'" *Id.* at 1243 (quoting 28A C.J.S. Easements § 173, at 391). The court concluded:

> *Hodel* instructs that "the initial determination of whether the activity falls within an established right of way is to be made by" the federal land management agency having authority over the lands in question. 848 F.2d at 1085. For the agency to be able to make that determination, Garfield County needs to communicate its plans to the Park Service in a meaningful fashion, and in turn, the Park Service has a duty to evaluate those plans and make the initial determination contemplated by *Hodel* in a timely and expeditious manner. If the County disagrees with the agency's decision, it may appeal or seek judicial review . . . .

*Id.* at 1243-44 (footnote omitted).

Although *Garfield County* involved an R.S. 2477 right of way within a

National Park, we see no reason why consultation of this sort is not equally required with respect to R.S. 2477 routes across BLM land. *Cf. Clouser*, 42 F.3d at 1538 (holding that National Forest Service had authority to forbid opening R.S. 2477 routes to motorized travel). The principle that the easement holder must exercise its rights so as not to interfere unreasonably with the rights of the owner of the servient estate, derives from general principles of the common law of easements rather than the peculiar status of National Parks. *See Jenks*, 22 F.3d at 1518 (holding, under "basic principles of property law," that easement rights are subject to regulation by the Forest Service as the owner of the servient estate). Just as the National Park Service has obligations to protect National Park land, the BLM has obligations to protect the land over which the roads at issue here pass. *See* FLPMA § 302(b), 43 U.S.C. § 1732(b) ("In managing the public lands, the Secretary shall, subject to this Act and other applicable law and under such terms and conditions as are consistent with such law, regulate, through easements [and] licences . . . the use, occupancy, and development of the public lands"). Unless it knows in advance when right-of-way holders propose to change the width, alignment, configuration, surfacing, or type of roads across federal land, the BLM cannot effectively discharge its responsibilities to determine whether the proposed changes are reasonable and necessary, whether they would impair or degrade the surrounding lands, and whether modifications in the plans should be

20

proposed.

The Counties argue, in effect, that as long as their activities are conducted within the physical boundaries of a right of way, their activities cannot constitute a trespass. But this misconceives the nature of a right of way. A right of way is not tantamount to fee simple ownership of a defined parcel of territory. Rather, it is an entitlement to use certain land in a particular way. To convert a two-track jeep trail into a graded dirt road, or a graded road into a paved one, alters the use, affects the servient estate, and may go beyond the scope of the right of way. *See Hodel*, 848 F.2d at 1083 ("[s]urely no Utah case would hold that a road which had always been two-lane with marked and established fence lines, could be widened to accommodate eight lanes of traffic"); *Jeremy v. Bertagnole*, 116 P.2d 420, 424 (Utah 1941) ("the use to which the way has been put measures the extent of the right to use"; "[a] bridle path abandoned to the public may not be expanded, by court decree, into a boulevard"). This does not mean that no changes can ever be made, but that any improvements must be made in light of the traditional uses to which the right of way had been put, fixed as of October 21, 1976. *Hodel*, 848 F.2d at 848. The Counties are correct that, under *Hodel*, the right-of-way holder may sometimes be entitled to change the character of the roadway when needed to accommodate traditional uses, but even legitimate changes in the character of the roadway require consultation when those changes go beyond routine maintenance.

21

Just because a proposed change falls within the scope of a right of way does not mean that it can be undertaken unilaterally.

We note that the Utah legislature in 1993 enacted the Rights-of-Way Across Federal Lands Act, Utah Code Ann. § 72-5-303, which provides that "[t]he owner of an R.S. 2477 right-of-way and the owner of the servient estate shall exercise their rights without unreasonably interfering with one another." *Id.* at § 72-5-303(2). This reflects a commendable spirit of mutual accommodation that should characterize the relations of levels of government in our federal system. Both levels of government have responsibility for, and a deep commitment to, the common good, which is better served by communication and cooperation than by unilateral action. *See also* Restatement (Third) of Property: Servitudes, §4.10 cmt. a (1998) ("In the absence of detailed arrangements between them, it is assumed that the owner of the servitude and the holder of the servient estate are intended to exercise their respective rights and privileges in a spirit of mutual accommodation.").

We therefore hold that when the holder of an R.S. 2477 right of way across federal land proposes to undertake any improvements in the road along its right of way, beyond mere maintenance, it must advise the federal land management agency of that work in advance, affording the agency a fair opportunity to carry out its own duties to determine whether the proposed improvement is reasonable

22

and necessary in light of the traditional uses of the rights of way as of October 21, 1976, to study potential effects, and if appropriate, to formulate alternatives that serve to protect the lands.[3]  The initial determination of whether the construction work falls within the scope of an established right of way is to be made by the federal land management agency, which has an obligation to render its decision in a timely and expeditious manner. The agency may not use its authority, either by delay or by unreasonable disapproval, to impair the rights of the holder of the R.S. 2477 right of way.  In the event of disagreement, the parties may resort to the courts.[4]

In drawing the line between routine maintenance, which does not require consultation with the BLM, and construction of improvements, which does, we endorse the definition crafted by the district court in *Garfield County*:

> Defined in terms of the nature of the work, "construction" for purposes of 36 C.F.R. § 5.7 includes the widening of the road, the horizontal or vertical realignment of the road, the installation (as distinguished from cleaning, repair, or replacement in kind) of

---

[3]The BLM also has authority to grant new rights of way.  *See* FLPMA §§ 501-511, 43 U.S.C. §§ 1761-1771.  Section 501(a) of FLPMA, 43 U.S.C. § 1761(a), authorizes the Secretary "to grant, issue, or renew rights-of-way over, upon, under, or through [public] lands for . . . (6) roads, trails, highways, . . . or other means of transportation . . . ."  Such rights of way issue "subject to such terms and conditions as the Secretary concerned may prescribe regarding extent, duration, survey, location, construction, maintenance, transfer or assignment, and termination."  FLPMA § 504(c); 43 U.S.C. § 1764(c); *see* 43 C.F.R. § 2801.2.

[4]The relative authority of courts and the agency is discussed in Section IV below.

23

bridges, culverts and other drainage structures, as well as any significant change in the surface composition of the road (*e.g.*, going from dirt to gravel, from gravel to chipseal, from chipseal to asphalt, etc.), or any "improvement," "betterment," or any other change in the nature of the road that may significantly impact Park lands, resources, or values. "Maintenance" preserves the existing road, including the physical upkeep or repair of wear or damage whether from natural or other causes, maintaining the shape of the road, grading it, making sure that the shape of the road permits drainage [, and] keeping drainage features open and operable--essentially preserving the status quo.

122 F. Supp.2d at 1253 (footnote omitted). Under this definition, grading or blading a road for the first time would constitute "construction" and would require advance consultation, though grading or blading a road to preserve the character of the road in accordance with prior practice would not. Although drawn as an interpretation of 36 C.F.R. § 5.7, which applies within national parks, the district court noted that: "This construction comports with the commonly understood meanings of the words, the pertinent statutes, agency interpretations, and the past experience of the parties on the Capitol Reef segment, including the experience leading up to February 13, 1996." *Id.* We therefore find it applicable to distinguishing between routine maintenance and actual improvement of R.S. 2477 claims across federal lands more generally.

Drawing the line between maintenance and construction based on "preserving the status quo" promotes the congressional policy of "freezing" R.S. 2477 rights of way as of the uses established as of October 21, 1976. *Hodel*, 848

F.2d at 1081. It protects existing uses without interfering unduly with federal land management and protection. As long as the Counties act within the existing scope of their rights of way, performing maintenance and repair that preserves the existing state of the road, they have no legal obligation to consult with the BLM (though notice of what they are doing might well avoid misunderstanding or friction). If changes are contemplated, it is necessary to consult, and the failure to do so will provide a basis for prompt injunctive relief. "Bulldoze first, talk later" is not a recipe for constructive intergovernmental relations or intelligent land management.

The record is not sufficient to determine whether the work performed by the Counties in the Fall of 1996 was routine maintenance or construction. On remand, therefore, the parties should be permitted to introduce evidence relevant to the question of trespass, as defined in this opinion.

## IV. PRIMARY JURISDICTION OVER R.S. 2477 RIGHTS OF WAY

We turn now to the district court's holding that none of the fifteen contested routes falls within a valid R.S. 2477 right of way. We address first the question of whether the district court should have treated this dispute as an appeal of an informal, but legally binding, administrative adjudication, or instead should have treated it as a de novo legal proceeding. We then turn to questions of substantive law.

25

As noted, on May 11, 1999, the district court stayed the litigation in order to allow the BLM to make an initial determination regarding the validity and scope of the Counties' claimed rights of way. The BLM ruled against the Counties, and SUWA filed a motion seeking to enforce that decision in the district court. The district court treated SUWA's motion as an appeal of informal agency action and therefore limited its review to the administrative record and employed the arbitrary and capricious standard of review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). In effect, it treated the initial stay as a binding primary jurisdiction referral. The Counties argue that the district court should have treated the BLM's decision not as a binding primary jurisdiction referral but as an internal, non-binding administrative determination.

The difference is significant. If the doctrine of primary jurisdiction applies, the BLM had authority to determine the validity of the R.S. 2477 claims in question, and judicial review is limited to determining whether there was substantial evidence in the BLM proceeding to support the agency's determinations. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574-75 (10th Cir. 1994). If not, and the district court's stay of the judicial proceeding and remand to the agency was solely for the purpose of enabling the agency to determine its own position in the litigation, then the district court should have conducted a de novo proceeding based on the plaintiffs' claims of trespass and

26

requests for declaratory judgments regarding the validity of the R.S. 2477 claims; the parties were entitled to introduce evidence in court (including but not limited to the administrative record), and questions of fact would be decided by the court on a preponderance of the evidence standard.

The circuits are split over the standard of review of decisions whether to recognize the primary jurisdiction of an administrative agency. This Court, like the Fourth and District of Columbia circuits, reviews decisions regarding primary jurisdiction under an abuse of discretion standard. *Marshall v. El Paso Natural Gas* Co., 874 F.2d 1373, 1377 (10th Cir. 1989); *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 947-948 (10th Cir. 1995). *Accord*, *Nat'l Tel. Coop. Ass'n v. Exxon Mobil Corp.* 244 F.3d 153, 156 (D.C. Cir. 2001)*; Envtl. Tech. Council v. Sierra Club* 98 F.3d 774, 789 (4th Cir.1996). Other circuits review such decisions de novo. *E.g.*, *Access Telecomms. v. Southwestern Bell Tel. Co.,* 137 F.3d 605, 608 (8th Cir. 1998) (reviewing the primary jurisdiction issue de novo without deciding the question); *Newspaper Guild of Salem v. Ottaway Newspapers, Inc.,* 79 F.3d 1273, 1283 (1st Cir. 1996); *National Communications Ass'n v. Am. Tel. & Tel. Co.,* 46 F.3d 220, 222 (2d Cir. 1995); *Int'l Bhd. of Teamsters v. Am. Delivery Ser. Co.,* 50 F.3d 770, 773 (9th Cir. 1995). We adhere to this circuit's standard of review, while noting that any error of law is presumptively an abuse of discretion and questions of law are reviewed de novo.

27

Primary jurisdiction is a prudential doctrine designed to allocate authority between courts and administrative agencies. An issue of primary jurisdiction arises when a litigant asks a court to resolve "[an] issue[] which, under a regulatory scheme, ha[s] been placed within the special competence of an administrative body." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). If the issue is one "that Congress has assigned to a specific agency," *Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir. 1996), the doctrine of primary jurisdiction allows the court to stay the judicial proceedings and direct the parties to seek a decision before the appropriate administrative agency. *Western Pac.*, 352 U.S. at 64. The agency is then said to have "primary jurisdiction."

There is no mechanical formula for applying the doctrine of primary jurisdiction. In each case, "the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Id.* at 64. The doctrine serves two purposes. First, it promotes regulatory uniformity by preventing courts from interfering sporadically with a comprehensive regulatory scheme. *See, e.g.*, *United States v. Radio Corp. of America*, 358 U.S. 334, 346, 350 (1959) (citing *Texas & P. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907)). Second, the doctrine promotes resort to agency expertise by allowing courts to consult

agencies on "issues of fact not within the conventional experience of judges." *Far East Conference v. United States*, 342 U.S. 570, 574 (1952); *See also Great N. R.R. Co. v. Merchants Elevators Co.*, 259 U.S. 285, 291 (1922). These two concerns—regulatory uniformity and agency expertise—drive the primary jurisdiction analysis. When a decision by a court would threaten the uniformity of a regulatory scheme or require the court to confront issues of fact outside of its conventional experience, the doctrine of primary jurisdiction allows the court to suspend the judicial process and direct the parties to seek a decision before the appropriate administrative agency. *Western Pac.*, 352 U.S. at 64.

All of this assumes that Congress has, by statute, given authority over the issue to an administrative agency. If not, there is no need to assess uniformity and expertise because the issue is not one that, "under a regulatory scheme, ha[s] been placed within the special competence of an administrative body." *Id.* at 64. Thus, before we delve into questions of uniformity and expertise, we must determine whether Congress has granted the BLM authority to determine validity of R.S. 2477 rights of way in the first place.

R.S. 2477 is silent on this question. It makes no mention of what body—courts or agencies—should resolve disputes over R.S. 2477 rights of way. The BLM argues that we should interpret this silence against the backdrop of general statutory provisions that give the BLM authority to execute the laws

29

regulating the acquisition of rights in the public lands.[5]  According to the BLM, there is a presumption that when Congress makes a grant of land and does not specify which agency, if any, is to administer the grant, the general statutory provisions giving the BLM authority over the public lands also give it authority over the grant.  The Counties counter that we should interpret the statutory silence against the backdrop of over one hundred years of practice under R.S. 2477.

---

[5]The BLM directs our attention to the Act of April 25, 1812, ch. 68 § 1, 2 Stat. 716 (codified as amended at 43 U.S.C. § 2), which established the General Land Office and gave it authority:

> to superintend, execute and perform, all such acts and things, touching or respecting the public lands of the United States, and other lands patented or granted by the United States, as have heretofore been directed by law to be done or performed in the office of the Secretary of State, of the Secretary and Register of the Treasury, and of the Secretary of War, or which shall hereafter by law be assigned to the said office.

As amended, this section now provides:

> The Secretary of the Interior or such officer as he may designate shall perform all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and, also, such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the Government.

43 U.S.C. § 2.

Also relevant are 43 U.S.C. § 1457, which states, "The Secretary of the Interior is charged with the supervision of public business relating to the following subjects and agencies: . . . 13. Public lands, including mines," and 43 U.S.C. § 1201, which states, "The Secretary of the Interior, or such officer as he may designate, is authorized to enforce and carry into execution, by appropriate regulations, every part of the provisions of Title 32 of the Revised Statutes not otherwise specially provided for."  Title 32 of the Revised Statutes originally consisted of R.S. §§ 2207-2490.

They maintain that both the BLM and the courts have always operated under the assumption that courts are the final arbiters of R.S. 2477 rights of way, and that this practice should inform our interpretation of the statute.

The BLM's argument, we believe, confuses a land agency's responsibility for carrying out the executive function of administering congressionally determined procedures for disposition of federal lands with the authority to adjudicate legal title to real property once those procedures have been completed. The latter is a judicial, not an executive, function. It is one thing for an agency to make determinations regarding conditions precedent to the passage of title, and quite another for the agency to assert a continuing authority to resolve by informal adjudication disputes between itself and private parties who claim that they acquired legal title to real property interests at some point in the past.[6]  In

---

[6]We distinguish the case of unpatented claims, where a private party makes an entry or claim on public land and acquires a provisional interest in the property, subject to agency supervision and regulation, and obtains title only upon performance of certain requirements and issuance of a patent by the land agency. Although unpatented claims are a species of real property, disputes over their validity are resolved administratively, and unpatented claims can be revoked by the agency, if an error was made or the agency determines the claim was invalid. *Boesche v. Udall*, 373 U.S. 472, 476-78 (1963); *Best v. Humboldt Mining Co.*, 371 U.S. 334, 337-39 (1963).  Only after a patent issues is the claim perfected, and from that point onward, issues regarding the nature and extent of the property right are resolved in court.  *United States v. Schurz*, 102 U.S. 378, 396 (1880). R.S. 2477, unlike most federal land law, does not provide for a patent and does not provide for any administrative process for perfecting a claim. *See* pages 33-34 below.

*Wilson v. Omaha Indian Tribe*, 442 U.S. 653 (1979), for example, the boundary of an Indian reservation had become unsettled by movement of the Missouri River. The Bureau of Indian Affairs, as trustee of the tribe's reservation lands, had land management authority (much as the BLM has authority here, pursuant to 43 U.S.C. § 2). Yet, rather than conducting an agency adjudication of the issue, with an appeal on the record in the federal court, the United States went into federal court and sued to quiet title. *Id.* at 660. Similarly, in *United States v. Jenks*, 22 F.3d 1513, 1517 (10th Cir. 1994), the National Forest Service disputed a landowner's claim of right to a patent or common law easement over national forest lands; rather than purporting to resolve the controversy through an administrative procedure, the Forest Service filed an action in court.

Perhaps more to the point, for over a century, in every Land Department or BLM decision in which parties sought a ruling on the validity of an R.S. 2477 claim, the agency maintained that this was a matter to be resolved by the courts. *See* pages 35-37 below. And in prior cases in this Circuit, the BLM has appeared as a litigant, without ever suggesting that its administrative determinations are entitled to legally enforceable status as a matter of primary jurisdiction. This case is the first occasion the government has ever purported to exercise the authority to resolve the validity of R.S. 2477 claims in an informal adjudication before the agency.

32

The BLM relies primarily on the Supreme Court's decision in *Cameron v. United States*, 252 U.S. 450 (1920). In that case, the owner of an unpatented mining claim applied to the Land Department (the BLM's predecessor) for a patent, which is the instrument by which the government conveys a grant of public land to a private person. After a hearing, the Department denied him a patent, concluding that the land was nonmineral in character and that there had been no adequate mineral discovery—in effect, declaring the claim invalid. When the United States later sued in district court to eject the claimant from the premises, the district court gave conclusive effect to the Land Department's declaration of invalidity. On appeal, the claimant argued that this was error; that, although the Land Department had authority to deny him a patent, it lacked authority to make a binding declaration on the validity of his claim. The Supreme Court disagreed, holding that the Land Department had authority to determine the validity of unpatented mining claims. According to the Court, this authority rested not on any specific grant of authority in the mineral land law, but on the general principle that, "in the absence of some direction to the contrary," the general statutory provisions giving the Land Department authority to execute the laws regulating the public lands also give it authority to inquire into claims against the government under a statutory grant of land. *Id.* at 461. The Supreme Court made clear, however, that the agency's authority continues only "so long as

33

the legal title remains in the government." *Id.* at 460. Once legal title passes by the issuance of a mining patent, "the power of the department to inquire into the extent and validity of the rights claimed against the government . . . cease[s]." *Id.* at 461 (quoting *Michigan Land & Lumber Co. v. Rust*, 168 U.S. 589, 593 (1897)).

The BLM urges us to extend the reasoning of *Cameron* to the R.S. 2477 rights of way at issue here. According to the BLM, the same general statutory provisions giving the Land Department authority to rule on the validity of unpatented mining claims should give the BLM authority to rule on the validity of R.S. 2477 rights of way. However, this argument ignores a fundamental difference between mining claims and R.S. 2477 rights of way: title to a mining claim passes by means of a patent, which is issued by the agency in accordance with specified procedures and subject to specified substantive prerequisites. Title to an R.S. 2477 right of way, by contrast, passes without any procedural formalities and without any agency involvement.

Mining claimants who want legal title must apply to the BLM for a patent. *See* 30 U.S.C. § 29 (derived from the Mining Law of 1872, Act of May 10, 1872, ch. 152, § 6, 17 Stat. 91, 92); 43 U.S.C. § 2; *see generally* 2 *American Law of Mining* § 51.03 (2d ed. 2004). The BLM then has authority to "consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open to

sale"—in effect, to decide whether the claim is valid. *Steel v. St. Louis Smelting & Refining Co.*, 106 U.S. 447, 451 (1882). The BLM will issue a patent—and thus pass title—only when it is satisfied that all statutory requirements have been met. *United States v. New Jersey Zinc Co.*, A-30782, 74 I.D. 191, 205-06 (1967). Furthermore, when a private party protests the issuance or nonissuance of a patent, the BLM has authority to hold a hearing and pass on the applicant's compliance with the statutory requirements. *See, e.g.*, *Devereux v. Hunter*, 11 Pub. Lands Dec. 214, 215-16 (1890); *Alice Placer Mine*, 4 Pub. Lands Dec. 314, 316-17 (1886). This determination is binding on courts, reviewable only in accordance with administrative law or in a direct action to cancel, modify, or issue the patent. *Cameron*, 252 U.S. at 460-61, 464; *St. Louis Smelting*, 104 U.S. at 640-41; *Oregon Basin Oil & Gas Co. v. Work*, 6 F.2d 676, 678 (D.C. Cir. 1925). Thus, prior to the issuance of a patent, the BLM retains authority and control over the subject lands, as well as over the process by which private parties assert claims. Once title passes, however, the BLM loses authority over the subject lands, and the title granted by the patent can be challenged only through the courts. *See United States v. Schurz*, 102 U.S. 378, 396 (1880).

Congress established a very different system for R.S. 2477 rights of way. Because there are no patents, title to rights of way passes independently of any action or approval on the part of the BLM. All that is required, as we explain

further in Section V.B.2, are acts on the part of the grantee sufficient to manifest an intent to accept the congressional offer. In fact, because there were no notice or filing requirements of any kind, R.S. 2477 rights of way may have been established—and legal title may have passed—without the BLM ever being aware of it. Thus, R.S. 2477 creates no executive role for the BLM to play.

This suggestion is confirmed by longstanding BLM practice under the statute. *See Sierra Club v. Hodel*, 848 F.2d 1068, 1080 (10th Cir. 1988) (practice under a statute is relevant evidence of how that statute should be interpreted) (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915)). Until very recently, the BLM staunchly maintained that it lacked authority to make binding decisions on R.S. 2477 rights of way.[7] Illustrative of this position is the BLM's

---

[7]*Kirk Brown*, 151 IBLA 221, 227 n.6 (1999) ("Normally, the existence of an R.S. 2477 road is a question of state law for adjudication by state courts."); *Sierra Club*, 104 IBLA 17, 18 (1988) ("[T]he Department has taken the position that the proper forum for adjudicating R.S. 2477 rights-of-way is the state courts in the state in which the road is located."); *James S. Mitchell, William Dawson*, 104 IBLA 377, 381 (1988) ("[T]he Department has taken the consistent position that, as a general proposition, state courts are the proper forum for determining whether, pursuant to [R.S. 2477], a road is properly deemed to be a 'public highway.'"); *Leo Titus, Sr.*, 89 IBLA 323, 337 (1985) ("[T]his Department has considered State courts to be the proper forum for determining whether there is a public highway under [R.S. 2477] and the respective rights of interested parties."); *Nick DiRe*, 55 IBLA 151, 154 (1981) ("[T]he question of the existence of a 'public highway' [under R.S. 2477] is ultimately a matter for state courts . . . ."); *Homer D. Meeds*, 26 IBLA 281, 298 (1976) ("[T]his Department has considered State courts to be the proper forum to decide ultimately whether a public highway under [R.S. 2477] has been created under State law and to

(continued...)

36

decision (or lack thereof) in *Alfred E. Koenig*, A-30139 (November 25, 1964).

There, an applicant seeking to purchase certain tracts of land asked the BLM to

adjudicate the validity of an asserted R.S. 2477 right of way. The BLM refused

on the ground that courts, not it, should be the final arbiter of R.S. 2477 claims.

The Secretary of the Interior affirmed:

> The Bureau's decision does leave the question of the status of the
> [R.S. 2477] road uncertain both for appellant and for the small tract
> lessees who may be affected by any determination regarding the
> status of the road insofar as it conflicts with lands leased by them or
> which may be patented to them. However, . . . . this Department has
> considered State courts to be the proper forum for determining
> whether there is a public highway under that section of the Revised
> Statues and the respective rights of interested parties. Thus, although
> the Bureau's conclusion may seem unsatisfactory to all of the parties
> concerned here, it was the proper conclusion in the circumstances as
> the questions involved are matters for the courts rather than this
> Department.

*Id.* at 2-3. This refusal to adjudicate R.S. 2477 disputes has been the consistent

position of the BLM and the IBLA for over one hundred years.[8] In its 1993

---

[7](...continued)
adjudicate the respective rights of interested parties."); *Herb Penrose*, A-29507 at
1-2 (July 26, 1963) ("State courts are the proper forums for determining the
protestant's rights and the rights of the public to use the existing . . . [R.S. 2477]
road."); Solicitor's M-Opinion, *Limitation of Access to Through-Highways
Crossing Public Lands*, M-36274, 62 I.D. 158, 161 (1955) ("Whatever may be
construed as a highway under State law is a highway under [R.S. 2477], and the
rights thereunder are interpreted by the courts in accordance with the State law.").

[8]*Wason Toll Road Co. v. Creede*, 21 Pub. Lands Dec. 351, 354-55 (1895)
appears to go the other way, holding that a townsite patent would issue subject to
an existing R.S. 2477 right of way. But the Land Department abandoned this
(continued...)

Report to Congress, the BLM explained that "[n]o formal process for either asserting or recognizing R.S. 2477 rights-of-way currently is provided in law, regulations, or DOI policy," and that "[c]ourts must ultimately dertermine [sic] the validity of such claims." U.S. Department of the Interior, *Report to Congress on R.S. 2477: The History and Management of R.S. 2477 Rights-of-Way Claims on Federal and Other Lands* 25 (June 1993) (hereinafter cited as *1993 D.O.I Report to Congress*).

The BLM also has been reluctant, until very recently, to issue regulations governing R.S. 2477 rights of way. In fact, its earliest regulation on the subject disclaimed any role for the federal government in implementing R.S. 2477. That regulation states, in its entirety:

> The grant [under R.S. 2477] becomes effective upon the construction or establishing of highways, in accordance with the State laws, over public lands not reserved for public uses. No application should be filed under said R.S. 2477 as no action on the part of the Federal Government is necessary.

43 C.F.R. § 244.55 (1939) (footnote omitted). This regulation reflects the position that R.S. 2477 gives the BLM no executive role, and indicates that the BLM interpreted the grant to take effect without any action on its part.

---

[8](...continued)
position the next year in *Dunlap v. Shingle Springs & Placerville R.R. Co.*, 23 Pub. Lands Dec. 67, 68 (1896). *See The Pasadena and Mt. Wilson Toll Road Co. v. Schneider*, 31 Pub. Lands Dec. 405, 408 (1902) (noting supersession).

Subsequent editions of the Code of Federal Regulations carried forward the same language,[9] which was not repealed until the code underwent extensive post-FLPMA (and, thus, post-R.S. 2477) revisions in 1980.

Moreover, not only has the BLM long declined to regulate R.S. 2477 rights of way, but Congress had forbidden it from doing so. In 1994, eighteen years after R.S. 2477 had been repealed, the BLM changed course and proposed comprehensive regulations governing R.S. 2477 rights of way. *See* 59 Fed. Reg. 39216, 39219-27 (1994). These rules proposed, for the first time, an administrative procedure by which the BLM would adjudicate the validity of R.S. 2477 claims. Congress responded with an appropriations provision prohibiting the Department of the Interior from issuing final rules governing R.S. 2477:

> No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. [§] 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act [Sept. 30, 1996].

---

[9]43 C.F.R. § 244.58(a) (1963) ("Grants of rights-of-way [under R.S. 2477] become effective upon the construction or establishment of highways, in accordance with the State laws, over public lands, not reserved for public uses. No application should be filed under R.S. 2477, as no action on the part of the Government is necessary."); 43 C.F.R. § 2822.2-1 (1974) ("Grants of rights-of-way [under R.S. 2477] become effective upon the construction or establishment of highways, in accordance with the State laws, over public lands, not reserved for public uses."); 43 C.F.R. § 2822.1-1 (1974) ("No application should be filed under R.S. 2477, as no action on the part of the Government is necessary.").

U.S. Department of the Interior and Related Agencies' Appropriations Act, 1997, § 108, enacted by the Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996).[10] The General Accounting Office has concluded that this provision has the status of permanent law. GAO Opinion B-277719 at 1-5 (Aug. 20, 1997).

SUWA argues that this congressional prohibition applies only to "final rule[s] or regulation[s]," and that Congress therefore must have wanted to preserve the BLM's authority to "issu[e] orders and engag[e] in adjudications related to R.S. 2477." SUWA Br. 67. But this ignores the fact that for over one hundred years the BLM had taken the position it could not issue binding orders adjudicating R.S. 2477 rights of way; there was, accordingly, no such authority to preserve. Prior to this litigation, even the BLM interpreted the prohibition as an indication that Congress chose to preserve the status quo, according to which courts, not the BLM, adjudicate R.S. 2477 rights of way.[11] But even assuming we

---

[10]Even before it prohibited the Department of the Interior from issuing regulations, Congress had forbidden the Department from using funds for "developing, promulgating, and thereafter implementing a rule concerning rights-of-way under section 2477 of the Revised Statutes." General Provisions, Department of the Interior § 110, enacted by the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. 104-134,, 110 Stat. 1321-177 (1996).

[11]In a memorandum issued shortly after the congressional prohibition, the Secretary of the Interior stated that in light of the prohibition, the BLM could make non-binding administrative determinations of R.S. 2477 rights of way where

(continued...)

cannot know the congressional intention behind the prohibition, its mere existence undercuts the BLM's primary jurisdiction argument. For primary jurisdiction is appropriate only if R.S. 2477 is an "issue[] which, under a regulatory scheme, ha[s] been placed within the special competence of an administrative body." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). It is highly unlikely that R.S. 2477 is such an issue when Congress has forbidden the BLM from issuing regulations on the subject or effectuating proposed rules creating a procedure for adjudicating R.S. 2477 claims.

In sum, nothing in the terms of R.S 2477 gives the BLM authority to make binding determinations on the validity of the rights of way granted thereunder, and we decline to infer such authority from silence when the statute creates no executive role for the BLM. This decision is reinforced by the long history of practice under the statute, during which the BLM has consistently disclaimed authority to make binding decisions on R.S. 2477 rights of way. Indeed, there have been 139 years of practice under the statute—110 years while the statute was in force, and 29 years since its repeal—and the BLM has not pointed to a single

---

[11](...continued)
there was "a demonstrated, compelling, and immediate need"; but that "[t]hose making claims of the existence of valid R.S. 2477 rights-of-way continue to have the option of seeking to establish the validity of their claims in court." Memorandum from the Secretary of the Interior to the Assistant Secretaries, *Interim Departmental Policy on Revised Statute 2477 Grant of Right of Way for Public Highways; Revocation of December 7, 1988 Policy* 2 (Jan. 22, 1997).

case in which a court has deferred to a binding determination by the BLM on an R.S. 2477 right of way. We conclude that the BLM lacks primary jurisdiction and that the district court abused its discretion by deferring to the BLM.

This does not mean that the BLM is forbidden from determining the validity of R.S. 2477 rights of way for its own purposes. The BLM has always had this authority. It exercises this authority in what it calls "administrative determinations." In its 1993 Report to Congress, the Department of the Interior explained that the BLM had developed "procedures for administratively recognizing and . . . record[ing] this information on the land status records." *1993 D.O.I Report to Congress*, at 25. These procedures "are not intended to be binding, or a final agency action." *Id.* Rather, "they are recognitions of 'claims' and are useful only for limited purposes," namely, for the agency's internal "land-use planning purposes." *Id.* at 25-26.[12] Nonetheless, they may reflect the

---

[12]Examples of administrative determinations include *Southern Utah Wilderness Alliance*, 111 IBLA 207, 214 (1989) ("[W]hile the courts may be the final arbiters whether a given R.S. 2477 right-of-way has legal existence, initial action defining and determining such a right-of-way is properly taken by BLM" when the issue is one "of 'administrative concern' and requires resolution by BLM in the administration of Departmental regulations respecting planning and permitting."); *Leo Titus, Sr.*, 89 IBLA 323, 337-38 (1985) (recognizing an "administrative necessity" exception to the general rule that "State courts [are] the proper forum for determining whether there is a public highway under [R.S. 2477] and the respective rights of interested parties."); *Nick DiRe*, 55 IBLA 151, 154 (1981) ("[W]hile the question of the existence of [an R.S. 2477 right of way] is ultimately a matter for state courts, BLM is not precluded from deciding the
(continued...)

42

agency's expertise and fact-finding capability, and as such will be of use to the court.

It was this administrative procedure that was at issue in *Hodel*, where we stated that "Tenth Circuit precedent requires that the initial determination of whether activity falls within an established right-of-way is to be made by the BLM and not the court."  848 F.2d at 1084 (internal citation and quotation marks omitted).  After the BLM made its initial administrative determination in *Hodel*, the district court conducted a twenty-five day trial on the merits, hearing testimony from twenty-six witnesses and making its own findings of fact.  This was not, as the BLM now argues, a primary jurisdiction referral.  It was an opportunity for the BLM to conduct an administrative determination for its own land-use planning purposes and to determine its own position in the litigation.  It was not binding on the parties, and it was not the object of formal legal deference from the district court (though the court's ultimate decision relied in part on

_____

[12](...continued)
issue . . . . The potential conflict is properly a matter of administrative concern.");
*Homer D. Meeds*, 26 IBLA 281, 298-99 (1976) ("[T]his Department has considered State courts to be the proper forum to decide ultimately whether a public highway under [R.S. 2477] has been created under State law and to adjudicate the respective rights of interested parties . . . . But where, as in this case, the BLM has ordered the road closed to public use . . . without any consideration having been given to the possible implications of the statute, it is appropriate that the Bureau review the propriety of its actions for its own purposes . . . .").

evidence from BLM expert witnesses).  Nothing in our decision today impugns the BLM's authority to make non-binding, administrative determinations, or the introduction and use of BLM findings as evidence in litigation.

## V. LEGAL ISSUES ON REMAND

Because the BLM lacks primary jurisdiction over R.S. 2477 rights of way, a remand is required to permit the district court to conduct a plenary review and resolution of the R.S. 2477 claims in this case.  On remand, the parties are permitted to introduce evidence regarding the validity and scope of the claims, including, but not limited to, the evidence contained in the administrative record before the BLM.

Bearing in mind the burden this places on the district court, and the importance of these issues to resolution of potentially thousands of R.S. 2477 claims in the State of Utah and elsewhere, this Court will proceed now to address some of the significant legal issues that have been briefed by the parties on appeal and ruled on by the court below.  This should not be understood as a comprehensive catalog of applicable legal principles.  Undoubtedly, new legal issues will arise in the course of the proceedings on remand.[13]  More importantly,

---

[13]For example, the parties have not addressed the issues of abandonment, substitution of equivalent routes, or federal government involvement in the construction or improvement of roads.  The parties are free to address these and other issues on remand, if relevant.

44

as explained below, we are aware that some of the central legal concepts involved in this case cannot be resolved in the abstract, but must necessarily be fleshed out in the context of the actual facts of the case.

## A.    State or Federal Law

The central question in this case is how a valid R.S. 2477 right of way is acquired.  As framed by the parties, the answer to this question turns on whether federal or state law governs the acquisition of rights of way under R.S. 2477.  For reasons discussed below, we are more doubtful than the parties that the choice between federal and state law is outcome determinative.  The principal difference between the federal and state standards, according to the parties, is whether acceptance of an R.S. 2477 right of way is dependent on actual "construction," meaning that "[s]ome form of mechanical construction must have occurred to construct or improve the highway," (the supposed "federal" standard adopted by the BLM), or whether it can be established by the "passage of vehicles by users over time" (the supposed "state" standard advocated by the Counties).  San Juan County (S.J.C.) Br. 27 (quoting BLM Manual 2801, Rel. 2-263, 2801.48B1b (March 8, 1989).  But it is far from clear, first, that "federal" standards are necessarily those adopted by the BLM in its administrative determinations in this case; those standards, while presumably helpful in setting forth the agency's thinking on the subject, have never formally been adopted in any agency action

45

with the force and effect of law, or adopted by any court as an interpretation of the terms of R.S. 2477. Moreover, it is far from clear that any of the R.S. 2477 claims under adjudication would pass the "usage" test and flunk the "construction" test, or vice versa. Much depends on questions of degree: what type, how frequent, and how well documented need the "passage of vehicles over time" have been to establish a right of way under state law, if applicable? How extensive must "construction" activities have been to establish a right of way under the BLM administrative definition? If the necessary extent of "construction" is the construction necessary to enable the general public to drive vehicles over the route, it may well turn out that the two standards will lead to the same results in most cases.

We nonetheless begin with this question: which law applies?

### 1. The BLM Interpretation

In making its administrative determinations, the BLM found that three criteria must be satisfied for a right of way to be recognized under R.S. 2477: "The claimed right-of-way must have been located on unreserved public lands; it must have been actually constructed; and it must have been a highway." The agency further defined each of these terms. *See* pages 80, 95, and 97-98 below. These criteria draw heavily on a 1980 letter written by the Deputy Solicitor of the Department of the Interior, Frederick Ferguson, to an Assistant Attorney General

46

at the Land and Natural Resources Division of the Department of Justice, James Moorman. Supp. App. 46 (April 28, 1980). In 1994, the criteria were incorporated in proposed regulations issued by the BLM. *See* 59 Fed. Reg. 39,216 (Aug. 1, 1994). Congress, however, passed a permanent appropriations rider preventing those regulations from taking effect unless expressly authorized by statute. U.S. Department of the Interior and Related Agencies' Appropriations Act, 1997, § 108, enacted by the Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996). Accordingly, the BLM criteria have never been adopted by the agency through a formal rule or regulation and do not have the force of law. Nonetheless, the BLM used these criteria in making each of the determinations at issue in this case.

The district court, recognizing that the BLM's interpretation of the statute "appears in informal policy statements and opinion letters," declined to accord the interpretation *Chevron* deference, instead giving it "respect," but "only to the extent that [it has] the 'power to persuade.'" *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 147 F.Supp.2d 1130, 1135 (D. Utah 2001) (quoting *Christiansen v. Harris County*, 529 U.S. 576, 586 (2000), in turn quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Under *Skidmore*, the degree of deference given informal agency interpretations will "vary with circumstances, and courts have looked to the degree of the agency's care, its consistency,

47

formality, and relative expertise, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (footnotes omitted). Upon consideration of each of the elements of the BLM's statutory interpretation, under this standard, the district court found "the BLM's statutory interpretation of R.S. 2477 to be both reasonable and persuasive and concur[red] with the BLM interpretation." 147 F.Supp.2d at 1145.

On appeal, the BLM contends that the district court erred in not according its interpretation *Chevron* deference, arguing that such deference is applicable to an agency's "interpretation of the relevant statute after an extensive adjudicatory proceeding in a final Secretarial action that carries the force of law, namely its administrative determinations concerning the validity of the Counties' right-of-way claims across public lands administered by the Secretary." BLM Br. 44. Because this Court concluded in the previous section of this opinion that the administrative determinations were not entitled to the force of law, this argument fails as well. The district court was correct to accord the BLM's interpretation no more than *Skidmore* deference.

The Counties argue that BLM's statutory interpretation is entitled to no deference at all. Describing the BLM's interpretation as a "mid-litigation attempt to create a federal standard of highway law," San Juan County argues that this Court should defer instead to regulations and policy statements from 1939, 1955,

48

1963, and 1974, which, the County argues, incorporated a state law standard. S.J.C. Br. 29-30. The County further notes that in 1988 the Secretary of the Interior issued a policy statement that repudiated arguments based on the 1980 Deputy Solicitor's letter. *Id*. at 28. The BLM counters that "[i]n contrast to the administrative determinations, the Department's various policy statements over the years interpreting R.S. 2477 did not have the force of law and did not legally bind the Department." BLM Br. 46 n.14. It notes also that the policy statement issued in 1988 was rescinded in 1997. *Id*.

While we have no reason to question the "care" with which the BLM approached its task of statutory interpretation, or the "formality" with which it conducted its administrative determinations, this squabble amply demonstrates that the agency's interpretation lacks the "consistency" that is required to warrant strong *Skidmore* deference. *Mead Corp.*, 533 U.S. at 228. As near as we can tell, the agency has shifted its position on this issue at least three times since the repeal of R.S. 2477 in 1976. In light of the fact that FLPMA explicitly preserved and protected R.S. 2477 rights of way in existence as of October 21, 1976, and that those rights have the status of vested real property rights, any post-1976 changes in agency interpretation of the repealed statute have questionable applicability.

The BLM argues that while the administrative determinations at issue here

"reflect the Department's interpretation of R.S. 2477 as it applies to those determinations, the Department retains discretion to reconsider its interpretation of R.S. 2477 in the context of future administrative policymaking, adjudications, determinations, and rulemaking." BLM Br. 44-45 n.13. While it is ordinarily true that agencies with the delegated authority to interpret and enforce federal statutes have the discretion to reconsider and change their interpretations, *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983), it is hard to square such law-changing discretion with the concept of property rights that vested, if at all, on or before a date almost 30 years ago. This is further reason to doubt that R.S. 2477 rights are subject to administrative definition and redefinition.

Moreover, we are hesitant to give decisive legal weight to an agency's interpretation when the regulations in which that interpretation was embodied were blocked by a vote of Congress. *See* U.S. Department of the Interior and Related Agencies' Appropriations Act, 1997, § 108, enacted by the Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996). To be sure, neither the language nor the legislative history of the congressional prohibition specifies what it was about the regulations Congress found objectionable. It is possible that Congress objected to the regulation's procedural provisions rather than its substantive interpretations of law.

Nonetheless, where Congress has taken action to prevent implementation of agency rules, and those rules have never been adopted by formal agency action, we do not think it appropriate for a court to defer to those rules in the interpretation of a federal statute.

This does not mean we disregard the BLM interpretation. It means only that the interpretation receives no more "respect" than what comes from its "persuasiveness." *Mead Corp.*, 533 U.S. at 228.

### 2. Sierra Club v. Hodel

The Counties, on the other hand, argue that this Court's decision in *Sierra Club v. Hodel*, 848 F.2d 1068 (10th Cir. 1988), established that state law, not federal law, governs determinations of R.S. 2477 rights of way. San Juan County argues that in adopting a federal standard, the district court "overruled this Court's *Hodel* decision affirming that establishment of a highway under state law perfected the right." S.J.C. Br. 30; *see also id.* at 17. More cautiously, Kane and Garfield Counties note that *Hodel* determined that "state laws govern the scope of R.S. 2477 rights-of-way," and that the "bases for its analysis" would lead to the same result with respect to the validity of a claimed R.S. 2477 right of way. K&G C. Br. 39.

The district court concluded that "[t]he Tenth Circuit's decision in *Hodel* addressed only the *scope* of R.S. 2477 rights-of-way already found to have been

51

established—it did not address the issue in this case, how R.S. 2477 rights-of-way are established in the first place." 147 F.Supp.2d at 1142 (emphasis in original). For the most part, we agree. In *Hodel*, the parties conceded the existence of the right of way, and that was not an issue in the case. 848 F.2d at 1079; *see id.* at 1080 ("The salient issue is whether the scope of R.S. 2477 rights-of-way is a question of state or federal law."). Even San Juan County concedes that "validity was not at issue in *Hodel*, only scope." S.J.C. Br. 20. We therefore hold that *Hodel* is not determinative of the question.

### 3. *Statutory text and precedent.*

Having rejected the arguments that deference under administrative law compels adoption of the BLM's statutory interpretation or that the precedent of *Hodel* compels adoption of state law, we turn then to the statute and to general principles of interpretation of federal law. R.S. 2477 was originally enacted as Section 8 of An Act granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for other Purposes, commonly called the Mining Act of 1866. Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253. The language is short, sweet, and enigmatic: "*And be it further enacted, that the right of way for the construction of highways over public lands, not reserved for public uses, is*

52

hereby granted." There is little legislative history.[14] Interestingly, Sections 1, 2, 4, 5, and 9 of the Act make explicit reference either to state law or to the "local customs or rules of miners" in the district. For example, Section 2 gives persons who discover certain minerals on public land, "having previously occupied and improved the same according to the local custom or rules of miners in the district where the same is situated," the right to apply for and obtain a patent for the tract. Section 5 provides that "in the absence of necessary legislation by Congress, the local legislature of any State or Territory may provide rules for working mines involving easements, drainage, and other necessary means to their complete development." This shows that when Congress intended application of state laws it did so explicitly. On the other hand, Sections 7, 10, and 11 make explicit reference to other federal laws. Section 7 refers to laws authorizing the President to appoint certain officers, Section 10 preserves the prior claims of homesteaders under the Homestead Act, and Section 11 authorizes the Secretary of the Interior to designate portions of the mineral lands that are "clearly agricultural lands" as such, making them subject to "all the laws and regulations applicable to the same." Section 8 refers to neither state law nor federal law. The *Hodel* court suggested that "[t]he silence of section 8 reflects the probable fact that Congress

---

[14]What little legislative history exists is summarized in the *1993 D.O.I Report to Congress*, at 9-10.

simply did not decide which sovereign's law should apply."  848 F.2d at 1080.

The real question, we think, is not whether state law applies or federal law applies, but whether federal law looks to state law to flesh out details of interpretation.  R.S. 2477 is a federal statute and it governs the disposition of rights to federal property, a power constitutionally vested in Congress.  U.S. Const. art. IV, § 3, cl. 2; *see Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917) (observing that the Property Clause gives Congress the power over the public lands "to control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may obtain rights in them"); *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976).  As the Supreme Court has stated, "The laws of the United States alone control the disposition of title to its lands.  The states are powerless to place any limitation or restriction on that control." *United States v. Oregon*, 295 U.S. 1, 27-28 (1935).  "The construction of grants by the United States is a federal not a state question." *Id.* at 28.

Even where an issue is ultimately governed by federal law, however, it is not uncommon for courts to "borrow" state law to aid in interpretation of the federal statute.  The Supreme Court has explained that "[c]ontroversies . . . governed by federal law, do not inevitably require resort to uniform federal rules. . . . Whether to adopt state law or to fashion a nationwide federal rule is a matter

of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'" *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727-28 (1979) (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 310 (1947)); *see also Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 671-72 (1979) (same); P. Bator, et al., Hart & Wechsler's, *The Federal Courts and the Federal System* 768 (2d ed. 1973) ("[I]t may be determined as a matter of choice of law, even in the absence of statutory command or implication, that, although federal law should 'govern' a given question, state law furnishes an appropriate and convenient measure of the content of this federal law."), *quoted in Wilson*, 442 U.S. at 672 n.19.

In the specific context of federal land grant statutes, the Court has explained that courts may incorporate state law "only in so far as it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction." *Oregon*, 295 U.S. at 28; *see United States v. Gates of the Mountains Lakeshore Homes, Inc.*, 732 F.2d 1411, 1413 (9th Cir. 1984) ("The scope of a grant of federal land is, of course, a question of federal law. But in some instances 'it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction as applicable to its conveyances.'") (quoting *Oregon*, 295 U.S. at 28)

55

(internal citation omitted).

In determining when to borrow state law in the interpretation of a federal statute, the Supreme Court has instructed courts to consider: whether there is a "need for a nationally uniform body of law," whether state law would "frustrate federal policy or functions," and what "impact a federal rule might have on existing relationships under state law." *Wilson*, 442 U.S. at 672. Those were the considerations the *Hodel* court consulted in determining that state law should govern the "scope" of R.S. 2477 grants. *Hodel*, 848 F.2d at 1082-83. It follows that to the extent state law is "borrowed" in the course of interpreting R.S. 2477, it must be in service of "federal policy or functions," and cannot derogate from the evident purposes of the federal statute. State law is "borrowed" not for its own sake, and not on account of any inherent state authority over the subject matter, but solely to the extent it provides "an appropriate and convenient measure of the content" of the federal law. Bator, et al., *supra*, at 768.[15]

---

[15]To be sure, R.S. 2477 constitutes an offer of rights of way, which requires acceptance by public authorities of the State. Such acceptance could entail public responsibilities for upkeep. *See Jeremy v. Bertagnole*, 116 P.2d 420, 423 (Utah 1941) ("[The] authorities are bound to keep the road open and in suitable repair, and, if obstructions be placed thereon, it is their duty to remove the same, and care for the rights of the public."). Accordingly, some states might wish to impose a higher standard for acceptance of the grant than is required under federal law. *See, e.g.*, *Tucson Consol. Copper Co. v. Reese*, 100 P. 777, 778 (Ariz. Terr. 1909) (requiring that all roads "be located and recorded by authority of the [county] board of supervisors" after a "petition of 10 or more resident

(continued...)

56

To modern eyes, R.S. 2477 may seem to stand on its own terms, without need for reference to any outside body of law. At the time of its enactment, however, the creation and legal incidence of "highways" was an important field within the common law, with well-developed legal principles reflected in numerous legal treatises and decisions. *See, e.g.*, Isaac Grant Thompson, *A Practical Treatise on the Law of Highways* (1868); Joseph K. Angell & Thomas Durfee, *A Treatise on the Law of Highways* (2d ed. 1868); John Egremont, *The Law Relating to Highways, Turnpike-Roads, Public Bridges and Navigable Rivers* (1830); Byron K. Elliott, *A Treatise on the law of Roads and Streets* (1890); *see also* James Kent, 3 *Commentaries on American Law* 572-76, *432-35 (10th ed. 1860) (subject covered in chapter on law of real property). When Congress legislates against a backdrop of common law, without any indication of intention to depart from or change common law rules, the statutory terms must be read as embodying their common law meaning. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992); *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989). It is reasonable to assume that when Congress granted rights of way for the construction of highways across the unreserved lands of the West

---

[15](...continued)
taxpayers within the county" before such roads can be considered "public highways" under R.S. 2477). Such limitations apply not as a matter of federal law, but as an expression of the authority of the state to govern its own acceptance of rights of way.

in 1866, it was aware of and incorporated the common law pertaining to the nature of public highways and how they are established.

In the decades following enactment of R.S. 2477, when disputes arose, courts uniformly interpreted the statute in light of this well-developed body of legal principles, most of which were embodied in state court decisions. In one early case, a landowner acquired title to a parcel of land from the United States and constructed a fence across what had been used, in previous years, as a public pathway between the town and its school. The Supreme Court of California held that under state law, five years of public use was sufficient for the public to acquire the right to use the path as a public way. *McRose v. Bottyer*, 81 Cal. 122, 125 (1889). "The fact that the land was public land of the United States at the time the right to use it as a public way was acquired . . . makes no difference. The act of Congress of 1866 (sec. 2477, R.S. U.S.) granted the right of way for the construction of highways over public land not reserved for public uses. By the acceptance of the dedication thus made, the public acquired an easement subject to the laws of this state." *Id.* at 126. The *Hodel* court cited some fifteen decisions in which state law definitions of "acceptance" of a public highway were employed to resolve R.S. 2477 disputes, 848 F.2d at 1082 n.13, and we have

located many more.[16]

One prominent example is the Supreme Court's decision in *Central Pacific Railway Co. v. Alameda County*, 284 U.S. 463 (1932), which involved a conflict between two rights of way in the bottom of a California canyon, one a public highway laid out in 1859 and "formed by the passage of wagons, etc., over the natural soil," and the other a right of way granted to the Central Pacific Railway Company under Acts of Congress in 1862 and 1864. *Id.* at 467. The ultimate question was whether R.S. 2477 applied retroactively to validate rights of way established prior to the enactment of the statute in 1866. The Court held that it did, and in the course of so holding, the Court acknowledged that state law governed the acceptance of the relevant R.S. 2477 right of way: "[T]he laying out

---

[16]*See, e.g.*, *Fitzgerald v. Puddicombe*, 918 P.2d 1017, 1019 (Alaska 1996); *Hamerly v. Denton*, 359 P.2d 121, 123 (Alaska 1961); *Boyer v. Clark*, 326 P.2d 107, 109 (Utah 1958); *Lovelace v. Hightower*, 168 P.2d 864, 866-67 (N.M. 1946); *Leach v. Manhart*, 77 P.2d 652, 653 (Colo. 1938); *Bishop v. Hawley*, 238 P. 284, 285 (Wyo. 1925); *State ex rel. Dansie v. Nolan*, 191 P. 150, 152-53 (Mont. 1920); *Sprague v. Stead*, 139 P. 544, 545-46 (Colo. 1914); *Stofferan v. Okanogan County*, 136 P. 484, 487 (Wash. 1913); *Hughes v. Veal*, 114 P. 1081, 1082-83 (Kan. 1911); *City of Butte v. Mikosowitz*, 102 P. 593, 595 (Mont. 1909); *Montgomery v. Somers*, 90 P. 674, 677 (Or. 1907); *Van Wanning v. Deeter*, 110 N.W. 703, 703-04 (Neb. 1907), *rev'd on other grounds*, 112 N.W. 902 (Neb. 1907); *Okanogan County v. Cheetham*, 80 P. 262, 264 (Wash. 1905), *overruled on other grounds by McAllister v. Okanogan County*, 100 P. 146, 148 (Wash. 1909); *Walcott Tp. of Richland County v. Skauge*, 71 N.W. 544, 546 (N.D. 1897); *Wells v. Pennington County*, 48 N.W. 305, 307-08 (S.D. 1891); *Murray v. City of Butte*, 14 P. 656, 656-57 (Mont. Terr. 1887); *Barker v. County of La Plata*, 49 F.Supp.2d 1203, 1214 (D. Colo. 1999).

*by authority of the state law* of the road here in question created rights of continuing user to which the government must be deemed to have assented [when it passed R.S. 2477]." *Id.* at 473 (emphasis added). Furthermore, when the railroad challenged the county's right of way as having been abandoned, the Court incorporated state law to guide its decision, citing a string of five state court decisions for the proposition that "the continuing identity of [a] road must be presumed until overcome by proof to the contrary, the burden of which rests upon the [party challenging the validity of an established road]." *Id.* at 468. In contrast to this and the many other decisions employing state law standards to resolve R.S. 2477 disputes, the parties have not cited, and we have not found, any cases before its repeal in which R.S. 2477 controversies were resolved by anything other than state law. This unanimity of interpretation over a great many years is entitled to weight. *See Sierra Club v. Hodel*, 848 F.2d 1068, 1080 (10th Cir. 1988) (practice under a statute is relevant evidence of how that statute should be interpreted) (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915).

It was the consistent policy of the BLM, as well as the courts, to look to common law and state law as setting the terms of acceptance of R.S. 2477 grants. In 1902, in *The Pasadena and Mount Wilson Toll Road Co. v. Schneider*, 31 Pub. Lands Dec. 405 (1902), the Department of the Interior considered whether toll

roads could be R.S. 2477 highways.  Its answer to that question drew directly

from the common law of "highways," as reflected in state court decisions,

common law treatises, and legal dictionaries:

> Section 2477 of the Revised Statutes grants "the right of way for the
> construction of highways over the public lands not reserved for
> public uses." A highway is "a road over which the public at large
> have a right of passage" (Dic. Loc. V.) and includes "every
> thoroughfare which is used by the public, and is, in the language of
> the English books, "common to all the King's subjects'" (3 Kent.
> Com., 432). Toll roads are highways, and differ from ordinary
> highways merely in the fact that they are also subjects of property
> and the cost of their construction and maintenance is raised by a toll
> from those using them, instead of by general taxation,
> *Commonwealth v. Wilkinson* (16 Pick., Mass., 175, 26 Am. Dec., 654
> [1834]); *Buncombe Turnpike Co. v. Baxter* (10 Ired., N. Car., 222
> [1849]). The obstruction of a turnpike toll road is indictable, under a
> statute against obstruction of highways. (*Nor. Cent. R. Co. v.
> Commonwealth*, 90 Pa. St., 300 [1879].) A highway may be a mere
> footway. (*Tyler v. Sturdy*, 108 Mass., 196 [1871].) Neither the
> breadth, form, degree of facility, manner of construction, private,
> corporate, or public ownership, or source or manner of raising the
> fund for construction and maintenance, distinguishes a highway, but
> the fact of general public right of user for passage, without
> individual discrimination, is the essential feature. The necessities and
> volume of traffic, difficulties of route, and fund available for
> construction and maintenance, will vary the unessential features, but
> the fact of general public right of user for passage upon equal terms
> under like circumstances is the one constant characteristic of a
> highway.

*Id.* at 407-408.  In its first regulation addressing R.S. 2477 claims, issued in 1939,

the BLM stated that "[t]he grant [under R.S. 2477] becomes effective upon the

construction or establishing of highways, *in accordance with the State laws*, over

public lands not reserved for public uses."  43 C.F.R. § 244.55 (1939) (emphasis

added).  BLM regulations continued to incorporate state law as the standard for recognizing R.S. 2477 rights of way until the repeal of R.S. 2477 in 1976.  *See* 43 C.F.R. § 244.58 (1963) ("Grants of rights-of-way [under R.S. 2477] become effective upon the construction or establishment of highways, in accordance with the State laws, over public lands, not reserved for public uses."); 43 C.F.R. § 2822.2-1 (1974) ("Grants of rights-of-way [under R.S. 2477] become effective upon the construction or establishment of highways, in accordance with the State laws, over public lands, not reserved for public uses."); *see also* Solicitor's M-Opinion, *Limitation of Access to Through-Highways Crossing Public Lands*, M-36274, 62 I.D. 158, 161 (1955) ("Whatever may be construed as a highway under State law is a highway under [R.S. 2477], and the rights thereunder are interpreted by the courts in accordance with the State law.").  Both before and after repeal, and until very recently, BLM administrative decisions took the same position.  *See, e.g., Kirk Brown*, 151 IBLA 221, 227 n.6 (1999) ("Normally, the existence of an R.S. 2477 road is a question of state law."); *Homer D. Meeds*, 26 IBLA 281, 298 (1976) ("[T]his Department has considered State courts to be the proper forum to decide ultimately whether a public highway under [R.S. 2477] has been created under State law and to adjudicate the respective rights of interested parties.").

This did not mean, and never meant, that state law could override federal

62

requirements or undermine federal land policy. For example, in an early decision, the BLM determined that a state law purporting to accept rights of way along all section lines within the county was beyond the intentions of Congress in enacting R.S. 2477. *Douglas County, Washington*, 26 Pub. Lands Dec. 446 (1898). The Department described this state law as "the manifestation of a marked and novel liberality on the part of the county authorities in dealing with the public land," and stated that R.S. 2477 "was not intended to grant a right of way over public lands in advance of an apparent necessity therefor, or on the mere suggestion that at some future time such roads may be needed." *Id.* at 447.[17] Similarly, in 1974, the BLM issued regulations clarifying that R.S. 2477 rights of way are limited to highway purposes, and do not encompass ancillary uses such as utility lines, notwithstanding state law to the contrary. *See* 43 C.F.R. § 2822.2-2 (1974). In none of the cases applying state law was there any suggestion of a conflict between the state law and any federal principles or interests. Rather, state law

---

[17]Ultimately, consistent with its policy of not adjudicating R.S. 2477 claims and leaving the resolution of those claims to courts, *see* pages 32-34 *supra*, the Land Department declined to make express reservation for the asserted right of way in a patent for a land grant. It explained: "If public highways have been, or shall hereafter be, established across any part of the public domain, in pursuance of law, that fact will be shown by local public records of which all must take notice, and the subsequent sale or disposition by the United States of the lands over which such highways are established will not interfere with the authorized use thereof, because those acquiring such lands will take them subject to any easement existing by authority of law." *Douglas County, Washington*, 26 Pub. Lands Dec. at 447.

was employed as a convenient and well-developed set of rules for resolving such issues as the length of time of public use necessary to establish a right of way, abandonment of a right of way, and priorities between competing private claims.

We do not believe application of state law in this fashion offends the criteria set forth in *Wilson* for appropriate borrowing of state law in the interpretation of federal statutes. The first question is whether there is a "need for a uniform national rule" regarding what steps are required to perfect an R.S. 2477 right of way. *See Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 673 (1979). We think not. Although the substantive content of state law could in some cases conflict with the purposes of federal law (the second *Wilson* criterion), we do not think uniformity for uniformity's sake is necessary in this area of the law. Indeed, there is some force to the view that interpretation of R.S. 2477 should be sensitive to the differences in geographic, climatic, demographic, and economic circumstances among the various states, differences which can have an effect on the establishment and use of routes of travel. A panel of the Ninth Circuit, for example, held that its decision in an R.S. 2477 case involving an Alaska claim "must take into account the fact that conditions in Alaska present unique questions, not easily answered." *Shultz v. Dep't of Army*, 10 F.3d 649, 655 (9th

Cir. 1993).[18]  Judge Fletcher, writing for the court, explained:

> Due to its geography, its weather, and its sparse and scattered
> population, Alaska's "highways" frequently have been no more than
> trails and they have moved with the season and the purpose for the
> transit – what travelled [sic] best in winter could be impassable knee-
> deep swamp in summer; what best accommodated a sled was not the
> best route for a wagon or a horse or a person with a pack.  By
> necessity routes shifted as the seasons shifted and as the uses shifted.
> What might be considered sporadic use in another context would be
> consistent or constant use in Alaska.

*Id.* (footnote omitted).  Analogous considerations might pertain in the southern

Utah canyon country in which this case arises.  The sparse population, rugged

terrain, scarcity of passable routes, seasonal differences in snow, mud, and stream

flow, fragile and environmentally sensitive land, and paucity of towns or other

centers of economic activity, could have an effect on the location of roads.

Moreover, for over 130 years disputes over R.S. 2477 claims were litigated

by reference to non-uniform state standards, a fact that casts serious doubt on any

claims of a need for uniformity today.  *See 1993 D.O.I Report to Congress*, at 2

("There have been few problems regarding R.S. 2477 rights-of-way in most public

land states although states have handled the issue differently.  This may be

because of the differences among state laws . . .").  When the BLM proposed

---

[18]On panel rehearing, the opinion in *Schultz* was withdrawn, 96 F.3d 1222
(9th Cir. 1996).  We therefore cite the opinion not as authority but for its
persuasive value.

nationwide standards for the first time in 1994, Congress responded by passing a permanent appropriations rider forbidding the implementation of those standards absent express authorization from Congress. U.S. Department of the Interior and Related Agencies' Appropriations Act, 1997, § 108, enacted by the Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996). At the time it took this action, Congress was aware that there were no uniform federal standards. *See 1993 DO.I. Report to Congress*, at 21 (noting the existence of "numerous and conflicting state and federal court rulings on R.S. 2477"). Congress's decision to perpetuate non-uniform standards provides support for the view that there is no "need for a uniform national rule." *Wilson*, 442 U.S. at 673.

The second *Wilson* criterion is whether "application of state law would frustrate federal policy or functions." Id. As we discuss specific state law standards, we will advert to congressional intention and other indications of federal policy. To the extent adoption of a state law definition would frustrate federal policy under R.S. 2477, it will not be adopted.

The third *Wilson* criterion, the "impact a federal rule might have on existing relationships under state law," *id.*, points in favor of continued application of state law. Both right-of-way holders and public and private landowners faced with potential R.S. 2477 claims have an interest in preservation

of the status quo ante. That is best accomplished by not changing legal standards. In *Hodel*, this Court observed that "R.S. 2477 rightholders, on the one hand, and private landowners and BLM as custodian of the public lands, on the other, have developed property relationships around each particular state's definition of the scope of an R.S. 2477 road." 848 F.2d at 1082-83. The same can be said of the *existence* of an R.S. 2477 road.

We therefore conclude that federal law governs the interpretation of R.S. 2477, but that in determining what is required for acceptance of a right of way under the statute, federal law "borrows" from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent. The applicable state law in this case is that of the State of Utah, supplemented where appropriate by precedent from other states with similar principles of law.

### B. Specific Legal Issues

We turn now to the criteria governing recognition of a valid R.S. 2477 right of way. First we address burden of proof, and then we turn to substantive standards. For reasons explained in the previous section, we begin with the common law standard as developed in the law of the State of Utah, a standard which is based on continuous public use. We will then address arguments by the BLM and SUWA that, instead of the public use standard, we should adopt a

67

"mechanical construction" standard, as set forth in the BLM administrative determinations, and that valid R.S. 2477 claims should further be limited by the BLM's proposed definition of "highway." Finally, we will address arguments by all parties regarding the meaning of the statutory term "not reserved for public uses."

We review the district court's legal determinations de novo. *United States v. Telluride Co.*, 146 F.3d 1241, 1244 (10th Cir. 1998).

### *1. Burden of proof*

The district court correctly ruled that the burden of proof lies on those parties "seeking to enforce rights-of-way against the federal government." 147 F.Supp.2d at 1136. Under Utah law determining when a highway is deemed to be dedicated to the use of the public,[19] "[t]he presumption is in favor of the property owner; and the burden of establishing public use for the required period of time is

---

[19]Utah Code Ann. § 27-12-89 (1953) (current version at Utah Code Ann. § 72-5-104(1) (2005)) provides:
> A highway shall be deemed to have been dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of ten years.

The Utah Supreme Court held a nearly identical earlier version of this statute applicable to R.S. 2477 claims in *Lindsay Land & Live Stock Co. v. Churnos*, 285 P. 646, 648 (Utah 1929), relying on Laws of Utah 1886, ch. 12, § 2 ("A highway shall be deemed and taken as dedicated and abandoned to the use of the Public when it has been continuously and uninterruptedly used as a Public thoroughfare for a period of ten years.").

on those claiming it." *Leo M. Bertagnole, Inc. v. Pine Meadow Ranches*, 639

P.2d 211, 213 (Utah 1981); *Draper City v. Estate of Bernardo*, 888 P.2d 1097,

1099 (Utah 1995).[20]  Courts in other states have reached a similar conclusion.

*See, e.g.*, *Luchetti v. Bandler*, 777 P.2d 1326, 1327 (N.M. App. 1989).  Because

evidence in these cases is over a quarter of a century old, the burden of proof

could be decisive in some cases.

This allocation of the burden of proof to the R.S. 2477 claimant is

consonant with federal law and federal interests.  As the district court noted,

"'[T]he established rule [is] that land grants are construed favorably to the

Government, that nothing passes except what is conveyed in clear language, and

that if there are doubts they are resolved for the Government, not against it."  147

F.Supp.2d at 1136 (quoting *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59

(1983), in turn quoting *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 116

(1957)) (brackets in district court opinion).  Other courts have applied this rule to

R.S. 2477 cases, *Adams v. United States*, 3 F.3d 1254, 1258 (9th Cir. 1993);

*United States v. Balliet*, 133 F.Supp.2d 1120, 1129 (W. D. Ark. 2001); *Fitzgerald

v. United States*, 932 F.Supp. 1195, 1201 (D. Ariz. 1996), and we agree.  On

---

[20]The burden may be different in cases where the R.S. 2477 claim has previously been adjudicated, or where there is a federal disclaimer of interest, memorandum of understanding, or other administrative recognition.  We have no occasion in this case to opine on the legal effect of such administrative determinations.

remand, therefore, the Counties, as the parties claiming R.S. 2477 rights, bear the burden of proof.

## 2. *The public use standard*

Under the common law, the establishment of a public right of way required two steps: the landowner's objectively manifested intent to dedicate property to the public use as a right of way, and acceptance by the public.[21] Isaac Grant Thompson, *A Practical Treatise on the Law of Highways* 48-52 (1868) (dedication); *id.* at 54-57 (acceptance); Joseph K. Angell & Thomas Durfee, *A Treatise on the Law of Highways* 146-65 (2d ed. 1868) (dedication); *id.* at 174-83 (acceptance); 6 R. Powell, *The Law of Real Property* § 84.01 (2005) (hereinafter Powell); *see The President, Recorder and Trustees of Cincinnati v. White's Lessee*, 31 U.S. (6 Pet.) 431, 438-40 (1832). Dedication by the landowner could be manifested by express statement or presumed from conduct, usually by allowing the public "the uninterrupted use and enjoyment of their privilege" over a specified period of time. *Thompson on Highways*, *supra*, at 48-49; *see also* James Kent, 3 *Commentaries on American Law* 604-06, *450-51 (10th ed. 1860);

---

[21]Alternatively, where land intended for highway use was privately owned and the landowner did not dedicate the land to use as a right of way, the government could proceed by condemnation and compensation. *See* Joseph K. Angell & Thomas Durfee, *A Treatise on the Law of Highways* 64-131 (2d ed. 1868). Because this case involves only routes across land that was public when the route was established, we will disregard this branch of the law.

70

for a modern example of presumed dedication, *see Draper City v. Estate of Bernardo*, 888 P.2d 1097, 1099 (Utah 1995). In the years after its enactment, R.S. 2477 was uniformly interpreted by the courts as an express dedication of the right of way by the landowner, the United States Congress. *See Murray v. City of Butte*, 14 P. 656, 656 (Mont. Terr. 1887); *McRose v. Bottyer*, 81 Cal. 122, 126 (1889); *Street v. Stalnaker*, 85 N.W. 47, 48 (Neb. 1901); *Wallowa County v. Wade*, 72 P. 793, 794 (Ore. 1903); *Okanogan County v. Cheetham*, 80 P. 262, 264 (Wash. 1905), *overruled on other grounds by McAllister v. Okanogan County*, 100 P. 146, 148 (Wash. 1909); *Nicolas v. Grassle*, 267 P. 196, 197 (Colo. 1928); *Lindsay Land & Live Stock Co. v. Churnos*, 285 P. 646, 648 (Utah 1929). The difficult question was whether any particular disputed route had been "accepted" by the public before the land had been transferred to private ownership or otherwise reserved. As one court noted:

> The act of congress already referred to [R.S. 2477] does not make any distinction as to the methods recognized by law for the establishment of a highway. It is an unequivocal grant of right of way for highways over public lands, without any limitation as to the method for their establishment, and hence a highway may be established across or upon such public lands in any of the ways recognized by the law of the state in which such lands are located; and in this state, as already observed, such highways may be established by prescription, dedication, user, or proceedings under the statute.

*Smith v. Mitchell*, 58 P. 667, 668 (Wash. 1899).

71

The rules for "acceptance" of a right of way by the public (whether under

R.S. 2477 or otherwise) varied somewhat from state to state. Some states

required official action by the local body of government before a public highway

could be deemed "accepted." *E.g., Tucson Consol. Copper Co. v. Reese*, 100 P.

777, 778 (Ariz. Terr. 1909); *Barnard Realty Co. v. City of Butte*, 136 P. 1064,

1067 (Mont. 1913) (legislature amended state law in 1895 to prohibit

establishment of a public road by use, unless accompanied by an action on the

part of public authorities). In such states, the appropriation of public funds for

repair was generally deemed sufficient to manifest acceptance by the public body.

*Angell & Durfee on Highways*, *supra*, at 181-82. In most of the western states,

where R.S. 2477 was most significant, acceptance required no governmental act,

but could be manifested by continuous public use over a specified period of

time.[22] This was the common law rule. "The common law mode of indicating an

---

[22]*E.g.*, *Hamerly v. Denton*, 359 P.2d 121, 123 (Alaska 1961) ("[B]efore a highway may be created, there must be either some positive act on the part of the appropriate public authorities of the state . . . or there must be public user for such a period of time and under such conditions as to prove that the grant has been accepted."); *Wilson v. Williams*, 87 P.2d 683, 685 (N.M. 1939) ("There is no particular method required or recognized as the proper one for the establishment of highways under this grant. Generally the construction of a highway or establishment thereof by public user is sufficient."); *Lindsay Land & Live Stock Co. v. Churnos*, 285 P. 646, 648 (Utah 1929) ("It has been held by numerous courts that the grant may be accepted by public use without formal action by public authorities . . . .") (citing cases); *Hatch Bros. Co. v. Black*, 165 P. 518, 519 (Wyo. 1917) ("The continued use of the road by the public for such a length of
(continued...)

acceptance by the public of a dedication is by a user of sufficient length to evince

such acceptance . . . ." *Thompson on Highways, supra*, at 54.[23] In some states, the

required period was the same as that for easements by prescription,[24] in some

states it was some other specified period, often five to ten years,[25] and in some

states it was simply a period long enough to indicate intention to accept.[26] *See*

*generally* Harry R. Bader, *Potential Legal Standards for Resolving the R.S. 2477*

---

[22](...continued)
time and under such circumstances as to clearly indicate an intention on the part of the public to accept the grant has generally been held sufficient" to constitute acceptance of an R.S. 2477 right of way.), *superseded by statute as noted in Yeager v. Forbes*, 78 P.3d 241, 255 (Wyo. 2003); *Van Wanning v. Deeter*, 110 N.W. 703, 704 (Neb. 1907) ("[T]he acceptance of the congressional grant could be shown, not only by acts of the public authorities, but by the acts of the public itself. In the case at bar . . . there is evidence of user, general and long continued. . . . This, we think, is amply sufficient to show an acceptance by the public of the congressional grant . . . ."), *rev'd on other grounds*, 112 N.W. 902 (Neb. 1907).

[23]"User" is the "enjoyment of a right of use: a right to use resulting from long-continued use." Webster's Third New International Dictionary 2524 (1976); *see* Black's Law Dictionary 1542 (7th ed. 1999) (defining "user" as "[t]he exercise or employment of a right or property"). We will use the terms "user" and "continuous public use" interchangeably.

[24]*See, e.g.*, *Vogler v. Anderson*, 89 P. 551, 552 (Wash. 1907); *City of Butte v. Mikosowitz*, 102 P. 593, 595 (Mont. 1909).

[25]*See* Powell, *supra*, at n.107; *Okanogan County v. Cheetham*, 80 P. 262, 264 (Wash. 1905) (holding that seven years of public use is sufficient to constitute acceptance of an R.S. 2477 right of way, as opposed to the ten years required for an easement by prescription, on the ground that "[i]t is not a matter of prescription, but of acceptance of a grant").

[26]*See* Powell, *supra*, at n.105; *Hatch Bros. Co. v. Black*, 165 P. 518, 519 (Wyo. 1917).

*Right of Way Crisis*, 11 Pace Envtl. L. Rev. 485, 491-94 (1994).

In the leading Utah decision interpreting R.S. 2477, the state Supreme Court explained:

> It has been held by numerous courts that the grant may be accepted by public use without formal action by public authorities, and that continued use of the road by the public for such length of time and under such circumstances as to clearly indicate an intention on the part of the public to accept the grant is sufficient. *Montgomery v. Somers*, 50 Or. 259, 90 P. 674; *Murray v. City of Butte*, 7 Mont. 61, 14 P. 656; *Hatch Bros. v. Black*, 25 Wyo. 109, 165 P. 518; *Sprague v. Stead*, 56 Colo. 538, 139 P. 544. Other decisions are to the effect that an acceptance is shown by evidence of user for such a length of time and under such conditions as would establish a road by prescription, if the land over which it passed had been the subject of private ownership[,] *Okanogan Co. v. Cheetham*, 37 Wash. 682, 80 P. 262, 70 L. R. A. 1027; *City of Butte v. Mikosowitz*, 39 Mont. 350, 102 P. 593, or of public user for such time as is prescribed in state statutes upon which highways are deemed public highways. *McRose v. Bottyer*, 81 Cal. 122, 22 P. 393; *Schwerdtle v. Placer County*, 108 Cal. 589, 41 P. 448; *Walcott Tp. v. Skauge*, 6 N. D. 382, 71 N. W. 544; *Great N. R. Co. v. Viborg*, 17 S. D. 374, 97 N. W. 6. See, also, annotation on necessity and sufficiency of acceptance, L. R. A. 1917A, 355.

*Lindsay Land & Live Stock Co. v. Churnos*, 285 P. 646, 648 (Utah 1929), *cited in Hodel*, 848 F.2d at 1082 n.13. Looking to the Utah statutes in force at the time the right of way was claimed to have been accepted, the Court held that the period of user necessary for acceptance of an R.S. 2477 right of way was ten years. *Id.*, citing Laws of Utah 1886, ch. 12, § 2 ("A highway shall be deemed and taken as dedicated and abandoned to the use of the Public when it has been continuously

74

and uninterruptedly used as a Public thoroughfare for a period of ten years.").

Acceptance of an R.S. 2477 right of way in Utah thus requires continuous public use for a period of ten years. The question then becomes how continuous and intensive the public use must be. The decisions make clear that occasional or desultory use is not sufficient. In the decision just quoted, the Utah Supreme Court stated: "While it is difficult to fix a standard by which to measure what is a public use or a public thoroughfare, it can be said here that the road was used by many and different persons for a variety of purposes; that it was open to all who desired to use it; that the use made of it was as general and extensive as the situation and surroundings would permit, had the road been formally laid out as a public highway by public authority." *Lindsay Land & Live Stock*, 285 P. at 648.

The requirements for establishing acceptance of a right of way by user cannot, we think, be captured by verbal formulas alone. It is necessary to set forth the factual circumstances of the decided cases, both those recognizing and those not recognizing the validity of R.S. 2477 claims. On remand, the district court will have the difficult task of determining whether the Counties have met their burden of demonstrating acceptance under these precedents.[27]

In *Lindsay Land & Live Stock*, the Utah Supreme Court described the

---

[27]On remand, the parties and the district court are not limited to precedents discussed in this opinion.

75

evidence bearing on usage of the claimed road in great detail:

The road extends across the lands in a general easterly and westerly direction following a part of its distance through a narrow canyon or pass called Davenport canyon. At the eastern terminus of the road is a large area of mountain land valuable for grazing animals in the summer season, a portion of which is now the Cache National Forest, and a portion in private ownership. This area has been extensively used for summer grazing for many years, by owners of sheep who trailed them over the route in question from the settled portions of the country lying to west, to the summer range in the spring of the year and back again in the fall. In 1876 a sawmill was constructed in Davenport canyon and the road in question was first definitely located and commenced to be used. People generally from the cities and villages in Box Elder and Cache counties approaching from the West traveled the road for the purpose of hauling lumber from the sawmill, and others from Ogden City and Ogden Valley, who had access to the eastern terminus of the road in question, used it for similar purposes. Other sawmills were set up at different places along the road during the years before 1890, and the road was generally traveled by many persons who had occasion to do so for the purpose of hauling logs to the sawmills and hauling lumber and slabs therefrom, and going to and from the sawmills for other purposes. In about the year 1885 a mining excitement in the locality resulted in the establishment of a mining camp called La Plata near the road in question. Houses were built, a post office established, and several hundred people resided in the camp for five or more years. During this period the road in question was traveled extensively by the general public in going to and from the mining camp. During all of the time from 1876 until shortly before the commencement of this action the road was used by numerous owners of sheep who had occasion to go that way for the purpose of trailing their herds to and from the summer range, and for the purpose of moving their camps and supplies to their herds. The use of the road for this purpose was general and extensive. One witness stated that "there must have been a hundred herds that went up there," another that he had "seen as high as seven herds a day" going over the road. The mining business ceased in about the year 1890 and a few years later the saw mills disappeared. From since about the year 1900 the use of the road has been confined to stockmen driving their herds and hauling their

76

supplies and camp outfits over it, and to a less frequent use by hunters, fishermen, and others who had occasion to travel over it. At times bridges were built and short dugways constructed by persons directly interested, but it does not appear that any public money was ever expended to maintain or repair the road. During the last four or five years the road in places has become impassable to ordinary vehicles, and has been used only for driving animals, pack outfits, etc., over it. Before the year 1894 the lands traversed by the road were unappropriated public lands of the United States. During the period of 1894 to 1904 the title to the lands passed from the federal government to the plaintiff or its grantors. The use of the road as above described was not interrupted by the change in the title or ownership of the lands, but continued thereafter as before stated. There was evidence that the travel over the road did not always follow an identical or uniform line, but at times and in a few places varied somewhat therefrom, and that sheep when trailing across would sometimes depart from the line of the road. There was ample positive evidence, however, that the road as described by the findings and decree was substantially the line and course of the road as it had been traveled and used for more than fifty years.

*Id*. at 647. Notwithstanding this extensive evidence of public use, the owner of the lands over which the route was located contended "that the use of the road, as proved, was not such as amounted to a continuous and uninterrupted use as a public thoroughfare." *Id.* at 648. The court responded:

If the claim rested alone upon the use of the road for sawmill purposes, or for mining purposes, or for the trailing of sheep, the question would be more difficult. But here the road connected two points between which there was occasion for considerable public travel. The road was a public convenience. When sawmills were established on or near the road, it was used, not only by those conducting the sawmills, but by many others who went to the sawmills to get lumber, etc. During the period when the mining camp existed in the vicinity, the road was unquestionably used very extensively by the general public for general purposes. And all the

77

> time it was used as a general way for the driving or trailing of sheep. This latter use was not by a few persons, but by many persons, and it involved more than the mere driving of animals on the road. Camp outfits and supplies accompanied the herds and were moved over the road in camp wagons and on pack horses.

*Id.* The court thus concluded that the trial court "was justified in finding that the road had been continuously and uninterruptedly used as a public thoroughfare for more than ten years." *Id.* at 648-49.

We think it significant that the Utah Supreme Court stated that if the claim rested "alone upon the use of the road for sawmill purposes, or for mining purposes, or for the trailing of sheep, the question would be more difficult." *Id.* at 648. But where the "road was unquestionably used very extensively by the general public for general purposes," the court concluded an R.S. 2477 right of way had been established. *Id.* At the opposite extreme, in *Cassity v. Castagno*, 347 P.2d 834, 835 (Utah 1959), the Utah Supreme Court declined to recognize an R.S. 2477 right of way where one cattleman had a practice of herding his cattle across the lands of another to get to and from winter grazing land.[28]

_____

[28]In *Deseret Livestock Co. v. Sharp*, 259 P.2d 607, 609 (Utah 1953), which involved a claim for a prescriptive easement under state law, the Court found that the public had acquired a 100-foot wide easement across private land because the route had been "traveled by various groups for a variety of private and commercial uses" over a period of 50 years, but rejected a claim that a 3,000-foot wide right of way had been established on the same route by the twice-annual trailing of sheep.

*Jeremy v. Bertagnole*, 116 P.2d 420 (Utah 1941), is similarly instructive.

In that case, the owner of the servient estate conceded that a right of way had been established by prescription, and the litigation concerned the width of that right of way. *Id.* at 421. Nonetheless, the court discussed at length the evidence in support of that legal conclusion. While technically relevant only to scope, this discussion provides guidance regarding the quality and quantity of evidence the Utah courts expect for proof of historical use. According to the Utah Supreme Court, "some thirteen witnesses testified to the use of the road for vehicular and other traffic between 1877 and 1900, and an equal number as to its use since the latter date." *Id.* at 423. The testimony covered the period from the 1870s until the time of trial, around 1940. *Id.* at 424. The court noted, "True, such testimony does not reveal that any witness used the road at weekly, monthly, or even yearly intervals over a period of ten years." *Id.* But the court described the "inference" as "clearly a reasonable one" that the route had been used "for a number of years in excess of that required," and that the evidence was sufficient to prove "the existence for many years of this roadway, openly used as the public might desire for vehicular, pedestrian, and equestrian traffic." *Id.*

In *Leo M. Bertagnole, Inc. v. Pine Meadow Ranches*, 639 P.2d 211, 213 (Utah 1981), the Utah Supreme Court upheld a finding of a public road by prescription where there was "evidence of the use of the road by large flocks of

79

sheep, sheep camps, trucks, jeeps, heavy equipment, hunters, fishermen, picnickers, campers, and sightseers" over a ten year period.

In *Boyer v. Clark*, 326 P.2d 107 (Utah 1958), the Supreme Court of Utah reversed a lower court judgment which had concluded that a "wagon trail" near Coalville, Utah, was not an R.S. 2477 right of way. The land over which the road crossed had passed into private hands in 1902, and the road had never been maintained at public expense. The evidence recited by the court suggests that the public use was less extensive than that in the previously discussed cases. The principal witness, who was 84 years old at the time of trial, testified that he "had used the road for over 50 years when hauling coal, crossing the open range, driving cattle, sheep and courting the girl he later married," and that "anyone who wanted to" used the road for similar purposes. *Id.* at 108. An unspecified number of "other witnesses" testified that the use of the road was not changed when the property became private and that "anyone who wanted to use it to go deer hunting or visiting with people living in the vicinity or to dances which were held in Grass Creek did so." *Id.* Apparently, "[t]he use of the road was not great because comparatively few people had need to travel over it, but those of the public who had such need, did so." *Id.* The Supreme Court held:

> The uncontradicted evidence in the instant case disclosed that for a
> period exceeding 50 years, the public, even though not consisting of
> a great many persons, made a continuous and uninterrupted use of

Middle Canyon Road in traveling by wagon and other vehicles and by horse from Upton to Grass Creek and other points as often as they found it convenient or necessary. They trailed cattle, and sheep, hauled coal, and used this trail for other purposes in traveling from Grass Creek and various other points to and from Highway 133. This evidence was sufficient as a matter of law to establish a highway by dedication and the court erred in finding otherwise.

*Id*. at 109.

In other jurisdictions we find decisions of a similar nature. In *Wallowa County v. Wade*, 72 P. 793 (Or. 1903), an early decision involving a claimed route across land homesteaded around the turn of the century, the Oregon Supreme Court affirmed a decree recognizing a public road and enjoining the defendant landowner from maintaining a fence across it. The evidence showed that "the road was used continuously by the public as a highway for more than 10 years prior to the construction of the fence." *Id*. at 793. Witnesses testified that "all this time it has been a plain, open, well-beaten track, and has been traveled by all the people that live in that section of the county; that it is the only road used by them in going to and returning from the county seat." *Id.* In *Dillingham Commercial Co., Inc. v. City of Dillingham*, 705 P.2d 410, 414 (Alaska 1985), the Alaska Supreme Court recognized an R.S. 2477 right of way on the basis of the uncontradicted testimony of two witnesses that the route had been used by the public for beach access and for hauling freight into town. In *Ball v. Stephens*, 158 P.2d 207, 211 (Cal. Dist. Ct. App. 1945), the California District Court of

Appeal recognized an R.S. 2477 claim along a route used originally by horse and wagon and later "almost daily" by motor vehicles. The court summed up the evidence as follows:

> The travel over the road prior to 1928 was irregular but that was due to the nature of the country and to the fact that only a limited number of people had occasion to go that way. However, many people used the road for different purposes. The use of the route by hunters, vacationists, miners and oil operators which brought the road into existence was a public use. Travel was not merely occasional; it was in our opinion substantial and sufficient to prove acceptance of the offer of the government of the right of way and to constitute it a highway by dedication under the state laws.

*Id.*

By contrast, in *Luchetti v. Bandler*, 777 P.2d 1326 (N.M. Ct. App. 1989), the New Mexico Court of Appeals affirmed a trial court decision rejecting an R.S. 2477 claim for a right of way, despite testimony by at least four witnesses that they and other members of the public used the road for picnics, hiking, hunting, and access to a spring.[29] The court concluded: "we cannot say that use to reach a single private residence, hike, picnic, or gather wood, or to reach a watering hole, was sufficient to require a finding of acceptance of the government's offer to dedicate the road as a public highway." *Id.* at 1328. Similarly, in *Moulton v.*

___

[29]Based on evidence that the road had become impassable and was closed by wire shortly after the relevant time period, the Court of Appeals suggested that the trial court "could have doubted that the road was used as extensively as testified to by defendant's witnesses." *Id.* at 1328-29.

82

*Irish*, 218 P. 1053 (Mont. 1923), the Montana Supreme Court reversed, as "not supported by the evidence," a trial court ruling that an R.S. 2477 highway existed, where two witnesses testified to use of a "road or trail along the creek," which they used "perhaps 'once a year, twice a year, three times; not over that; maybe some years not at all.'" *Id.* at 1055, 1054. *See also Hamerly v. Denton*, 359 P.2d 121, 125 (Alaska 1961) (acceptance not established by infrequent and sporadic use, by sightseers, hunters, and trappers, of a dead-end road running into wild, unenclosed, and uncultivated land); *State ex rel. Dansie v. Nolan*, 191 P. 150, 152 (Mont. 1920) ("It is inconceivable that it was the intention of Congress and of the Legislature to say that two or more persons crossing at random on each of a dozen trails . . . could constitute an acceptance of the government grant as to each of such trails . . . ."); *Town of Rolling v. Emrich*, 99 N.W. 464, 465 (Wis. 1904) (rejecting R.S. 2477 claim on the basis of "a few months' desultory use by a few persons of a logging road or trail through the woods, with no acts by the public authorities of any kind").

### 3. The "mechanical construction" standard

The BLM and SUWA argue that mere public use cannot suffice to establish an R.S. 2477 right of way. Instead, following the BLM administrative determinations in this case, they contend that R.S. 2477 requires that "[s]ome form of mechanical construction must have occurred to construct or improve the

highway." *BLM R.S. 2477 Administrative Determination(s) – San Juan County Claims* at 5, Aplt. App. Vol. 1 at 249 ("San Juan Admin. Det."); Garfield Admin. Det. at 4, Aplt. App. Vol. 2 at 307; *see also* Kane Admin. Det. at 5, Aplt. App. Vol. 2 at 371. "A highway right-of-way cannot be established by haphazard, unintentional, or incomplete actions. For example, the mere passage of vehicles across the land, in the absence of any other evidence, is not sufficient to meet the construction criteria of R.S. 2477 and to establish that a highway right-of-way was granted." "Evidence of actual construction may include such things as road construction or maintenance records, aerial photography depicting characteristics of physical construction, physical evidence of construction, testimony or affidavits affirming that construction occurred, official United States Government maps with legends showing types of roads, as well as other kinds of information." *Id.*

The BLM and SUWA cite no pre-1976 authority for this interpretation of R.S. 2477, and we are aware of none. No judicial or administrative interpretation of the statute, prior to its repeal, ever treated "mechanical construction" as a pre-requisite to acceptance of the grant of an R.S. 2477 right of way. The standard has no support in the common law, which, as we have noted,[30] formed the statutory backdrop for R.S. 2477. In no state was mechanical construction of a

---

[30]*See* pages 54-60 above.

84

highway deemed necessary for acceptance of a public right of way. Even the BLM took the opposite position not long ago. *See* BLM Manual 2801, Rel. 2-263, 2801.48B1b (March 8, 1989), reprinted in 1993 D.O.I. Report to Congress, App. II, Exh. M ("passage of vehicles by users over time may equal construction").

The Utah Supreme Court has recognized the validity of an R.S. 2477 claim despite the fact that the road in question "has never been maintained at public expense," and without any mention of evidence of construction. *Boyer v. Clark*, 326 P.2d 107, 108 (Utah 1958). In other cases recognizing R.S. 2477 rights of way, the Utah Supreme Court noted construction that had been done on the roads, but only as evidence contributing to the general conclusion of sufficient public use, and without treating the issue of construction as legally significant. *Lindsay Land & Live Stock Co. v. Churnos*, 285 P. 646, 647 (Utah 1929) ("At times bridges were built and short dugways constructed by persons directly interested, but it does not appear that any public money was ever expended to maintain or repair the road."); *Jeremy v. Bertagnole*, 116 P.2d 420, 421 (Utah 1941) (calling the road "well traveled, worked, and defined"). Similarly, in *Hughes v. Veal*, 114 P. 1081, 1083 (Kan. 1911), the court noted that "work has been done on the road by those in charge of the highways in that locality," but in determining that the right of way had been accepted by the public, the court "rest[ed] the decision" on

"the concurring acceptance of the officers and the public itself at and shortly after the location of the road."

The few decisions in which a construction standard is discussed rejected it. In *Nicolas v. Grassle*, 267 P. 196, 197 (Colo. 1928), the Colorado Supreme Court held:

> The district court . . . thought the word 'construction' in the congressional grant required that, to constitute an acceptance, work must be done on the road. We do not think so. The purpose of the act was to give every settler, however unable to build a road, lawful access to whatever land he chose to enter. If access is feasible without work with pick and shovel no such work is necessary, and it would be a mistake to hold that action by any governmental authority is required.

In *Wilkenson v. Dep't of Interior*, 634 F. Supp. 1265, 1272 (D. Colo. 1986), the federal district court stated:

> The defendants cite the rule of statutory construction that all words in a statute must be given effect, and argue that for the grant to be accepted, this rule requires that there be actual 'construction,' meaning 'more than mere use' of a highway. However, in Colorado, mere use is sufficient.
>
> > [T]he statute is an express dedication of a right of way for roads over unappropriated government lands, acceptance of which by the public results from 'use by those for whom it was necessary or convenient.' It is not required that 'work' shall be done on such a road, or that public authorities shall take action in the premises. User is the requisite element, and it may be by any who have occasion to travel over public lands, and if the use be by only one, still it suffices.

86

(quoting *Leach v. Manhart*, 77 P.2d 652, 653 (Colo. 1938)); *accord, Barker v. County of La Plata*, 49 F.Supp.2d 1203, 1214 (D. Colo. 1999). *See also Wallowa County v. Wade*, 72 P. 793, 794 (Or. 1903) (affirming R.S. 2477 claim despite the servient landowner's showing that "the road over the land inclosed by him had never been worked or improved by the county authorities, or under their direction"); *Fitzgerald v. Puddicombe*, 918 P.2d 1017, 1020 (Alaska 1996) ("[n]or does the route need to be significantly developed to qualify as a 'highway' for RS 2477 purposes"); *Ball v. Stephens*, 158 P.2d 207, 209 (Cal. Dist. Ct. App. 1945) (recognizing R.S. 2477 right of way even though "it was never improved or maintained by the county").

Consistent with our conclusion that acceptance of the grant of R.S. 2477 rights of way is governed by long-standing principles of state law and common law, we cannot accept the argument that mechanical construction is necessary to an R.S. 2477 claim. Adoption of the "mechanical construction" criterion would alter over a century of judicial and administrative interpretation. This is not to say that evidence of construction is irrelevant. Construction or repair at public expense has sometimes been treated as a substitute for public use,[31] as shortening

---

[31] *Memmott v. Anderson*, 642 P.2d 750, 753 (Utah 1982); *see Streeter v. Stalnaker*, 85 N.W. 47, 48 (Neb. 1901) ("In this case there was not only evidence of user, general and long continued, but also proof that the public authorities had assumed control over the road, and had worked and improved a portion of it.

(continued...)

87

the period of public use necessary for establishing acceptance,[32] or as evidence of

public use or lack thereof.[33]  Thus, although there are no Utah cases directly on

point, we hold that evidence of actual construction (appropriate to the historical

period in question), or lack thereof, can be taken into consideration as evidence of

the required extent of public use, though it is not a necessary or sufficient

---

[31](...continued)
Both facts were competent evidence tending to show an acceptance of a
dedication."); *Moulton v. Irish*, 218 P. 1053, 1055 (Mont. 1923) (finding no
evidence "to establish the construction of a road *or* its continuous use by the
public over a definite and fixed course") (emphasis added); *Wilson v. Williams*,
87 P.2d 683, 685 (N.M. 1939) ("Generally the construction of a highway or
establishment thereof by public user is sufficient."); *Town of Rolling v. Emrich*,
99 N.W. 464, 465 (Wis. 1904) (acceptance of R.S. 2477 right of way could be "by
county authorities by surveying, platting, and marking out a road," or by 20 years'
use by the public); *Roberts v. Swim*, 784 P.2d 339, 342-43, 346 (Idaho Ct. App.
1989) (right of way could be established under state law by prescriptive easement
on the basis of "open, notorious, continuous, uninterrupted use" for five years, or
as a public highway by public maintenance and use for five years).

[32]In Washington, the period of public use necessary for acceptance of an
R.S. 2477 right of way was seven years where the road was "worked and kept up
at the expense of the public," and ten years otherwise.  *Stofferan v. Okanogan
County*, 136 P. 484, 487 (Wash. 1913).

[33]In the course of rejecting an R.S. 2477 claim, the Wisconsin Supreme
Court noted that "there was no proof of any expenditure of public funds thereon,
or of any working of the same by highway officials."  *Town of Rolling v. Emrich*,
99 N.W. 464, 465 (Wis. 1904).  *See also Simon v. Pettit*, 687 P.2d 1299, 1303
(Colo. 1984) ("evidence that the city had maintained the footpaths or included
them on a map of the city's street system would be a strong indication that the
paths had acquired a status as public highways"); *Hatch Bros. Co. v. Black*, 165 P.
518, 520 (Wyo. 1917) (noting that "those using the road had done considerable
work thereon by making dugways, constructing bridges, etc.; one witness
testifying that he had spent about $500 on it about 1891") *superseded by statute
as noted in Yeager v. Forbes*, 78 P.3d 241, 255 (Wyo. 2003).

element.  This case does not raise the question, and we do not decide, whether a road officially laid out or erected for public use by state or local governmental authority, prior to repeal of R.S. 2477, would qualify as a highway without proof of ten years' continuous public use.  *See* Utah Code Ann. Sec. 72-1-102(7) (West 2004).

The BLM and SUWA defend their proposed "mechanical construction" standard primarily as dictated by the "plain meaning" of R.S. 2477, which grants the rights of way for the "construction" of highways.  The BLM quotes the definition of "construction" from an 1860 edition of Webster's Dictionary as "[t]he act of building, or of devising and forming, fabrication."  BLM Br. 48.  SUWA quotes a similar definition from an 1865 edition of Webster's as:

> 1.  The act of construction; the act of building, or of devising and forming; fabrication; composition. 2.  The manner of putting together the parts of any thing so as to give to the whole its peculiar form; structure; conformation.

SUWA Br. 21.  That same dictionary supplies these synonyms: to "build; erect; form; make; originate; invent; fabricate."  *Id*.

We are not persuaded.  First, it would take more semantic chutzpah than we can muster to assert that a word used by Congress in 1866 has a "plain meaning" that went undiscerned by courts and executive officers for over 100 years.  But even confining ourselves to the quoted dictionary definitions of "construction,"

89

we are left with a wide range of meanings, including "build," "form," and "make." If nineteenth-century pioneers made a road across the wilderness by repeated use—the so-called "beaten path"—this would fall squarely within the scope of the quoted definition. Such a road would be "formed" and "made" even if no mechanical means were employed. *See Cent. Pac. Ry. Co. v. Alameda County*, 284 U.S. 463, 467 (1932) (referring to R.S. 2477 roads originally "*formed* by the passage of wagons, etc., over the natural soil") (emphasis added)*; Wallowa County v. Wade*, 72 P. 793 (Or. 1903) ("all this time [the road] has been a plain, open, well-beaten track")*.* Moreover, we must not forget that R.S. 2477 was enacted against a backdrop of a well-developed common law of highways. Early interpreters naturally assumed that its terms should be read in light of the common law concepts of dedication and acceptance. Thus, courts would speak of a highway being "definitely established *and constructed* in some one of the ways authorized by the laws of the state in which the land is situated," including having been "used or traveled by the people generally for the period named in the statutes of limitation." *State ex rel. Dansie v. Nolan*, 191 P. 150, 152, 153 (Mont. 1920) (emphasis added and citation and quotations omitted).

In addition to their "plain language" argument, the BLM and SUWA seek support in *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1, (1896), which addressed the meaning of the term "construction" in a different

90

section of the same statute that contained R.S. 2477. That section dealt with grants of rights of way for "the construction . . . of ditches." *Id*. at 17 (quoting Act of July 26, 1866, Ch. 262, § 9, 14 Stat. 251, 253 (later codified as R.S. 2339)). In *Bear Lake*, the Court held that no right of way vests against the government "from the mere fact of such possession, unaccompanied by the performance of any labor thereon. . . . It is the doing of the work, the completion of the well, or the digging of the ditch . . . that gives the right to use the water in the well, or the right of way for the ditches of the canal upon or through the public land." 164 U.S. at 18-19. The BLM and SUWA argue that the same word, "construction," must be given the same meaning in two sections of what was originally the same statute.

Again, we are unpersuaded. The dispute in *Bear Lake* was over which of two creditors had priority with respect to a canal owned by the debtor: the canal construction company, which had a lien on the product of its labors, or the mortgage company, which held a lien on the debtor's real property. The outcome turned on whether the debtor acquired title to the canal property when it began the project (in which case the mortgage company would prevail), or upon completion of the canal (in which case the construction company enjoyed a priority). The Court held that title did not vest until the canal had been dug, just as an R.S. 2477 right of way does not vest until the road is formed, by user or otherwise. The type

91

or degree of work expended on the ditch was immaterial to the decision. It so happens that canals, unlike roads, cannot be created by mere use, so the question with which we are concerned could not arise in *Bear Lake*.[34]

SUWA also points to a number of instances in which the Utah legislature appropriated funds for the construction of roads, specifying work that included surveying, cleaning, grading, ditching, macadamizing, and so forth. But that some roads were built to a higher level of engineering specifications does not mean that other roads, formed by repeated use, were not "constructed."[35]

SUWA supplements its argument that "construction" must refer to "resource-intensive construction," SUWA Br. 28, by reference to the probable intention of Congress in granting rights of way for highways. According to SUWA, Congress enacted R.S. 2477 "to spur investment in and development of internal improvements" by "grant[ing] a permanent right-of-way in exchange for the 'construction' of highways." *Id.* at 33. "Like other land-grant statutes, R.S.

---

[34]The same is true of the construction of railroads. *See Jamestown & N. R.R. Co. v. Jones*, 177 U.S. 125, 132 (1900) (holding that railroad right of way under the Act of March 3, 1875, ch. 152, 18 Stat. 482, vested upon "actual construction" of the road).

[35]SUWA quotes this Court's *Hodel* decision to the effect that "'[c]onstruction' indisputably does not include the beaten path." SUWA Br. 24 (quoting *Hodel*, 848 F.2d at 1080). SUWA neglects to note that the quotation is from the *Hodel* court's summary of the position of the Sierra Club in the case, a position which was not adopted by the Court.

92

2477 provided an incentive and reward for the expenditure required to construct a highway." *Id*. at 28. The trouble with this theory is that those who made the investment in the road did not receive any rights to it; R.S. 2477 rights of way are owned by the public and not by the individuals who "constructed" the highways. A more probable intention of Congress was to ensure that widely used routes would remain open to the public even after homesteaders or other land claimants obtained title to the land over which the public traveled. That explanation of congressional intent is more consistent with the common law interpretation than with the Appellees' proposed substitute.

We must not project twenty-first (or twentieth) century notions of "mechanical construction" onto an 1866 statute. Historical records of early southern Utah road "construction" indicate that work was performed as economically as possible: if wagons could be conveyed across the land without altering the topography, there was no need for more extensive construction work. Typically, little more was done than move boulders, clear underbrush or trees, or dig the occasional crude dugway. *See* Jay M. Haymond, *A Survey of the History of the Road Construction Industry in Utah* 2 (1967) (unpublished M.A. thesis, Brigham Young University) (on file with the University of Utah Marriott Library) ("road building in the early days consisted only of removing rocks and stumps and filling in holes"). This is one reason an early court rejected the argument that

93

"work must be done on the road" to constitute acceptance of an R.S. 2477 grant. *Nicolas v. Grassle*, 267 P. 196, 197 (Colo. 1928). "If access is feasible without work with pick and shovel no such work is necessary, and it would be a mistake to hold that action by any governmental authority is required." *Id. See also Ball v. Stephens*, 158 P.2d 207, 210 (Cal. Dist. Ct. App. 1945) (the disputed route "came to be a road by means of being used as a road and in the same fashion that many other mountain roads have come into existence"); *id*. at 211 (the land "is somewhat flat and vehicles could be and were driven across it without the necessity of road construction"). Surely Congress did not require mechanical construction where no construction was needed. The necessary extent of "construction" would be the construction necessary to enable the general public to use the route for its intended purposes.

For this reason, we are skeptical that there is much difference, in practice, between a "construction" standard (if applied in light of contemporary conditions) and the traditional legal standard of continuous public use. If a particular route sustained substantial use by the general public over the necessary period of time, one of two things must be true: either no mechanical construction was necessary, or any necessary construction must have taken place. It is hard to imagine how a road sufficient to meet the user standard could fail to satisfy a realistic standard of construction. Thus, we do not necessarily disagree with the BLM's statement

94

that:

> A highway right-of-way cannot be established by haphazard, unintentional, or incomplete actions.  For example, the mere passage of vehicles across the land, in the absence of any other evidence, is not sufficient to meet the construction criteria of R.S. 2477 and to establish that a highway right-of-way was granted.

Aplt. App. Vol. 1 at 249; Aplt. App. Vol. 2 at 307, 452.  The standard for acceptance of an R.S. 2477 right of way in Utah is "continued use of the road by the public for such length of time and under such circumstances as to clearly indicate an intention on the part of the public to accept the grant."  *Lindsay Land & Live Stock Co. v. Churnos*, 285 P. 646, 648 (Utah 1929).  As the precedents in Utah and other states demonstrate, a road may be created intentionally, by continued public use, without record evidence of what the BLM defines as "mechanical construction."  Such action is not haphazard, unintentional, or incomplete, though it might lack centralized direction; and the legal standard is not satisfied "merely" by evidence that vehicles may have passed over the land at some time in the past.  That is a caricature of the common law standard.

Indeed, contrary to the apparent assumptions of the parties, it is quite possible for R.S. 2477 claims to pass the BLM's "mechanical construction" standard but to fail the common law test of continuous public use.  *See Town of Rolling v. Emrich*, 99 N.W. 464, 464 (Wis. 1904) (rejecting R.S. 2477 claim despite evidence that two men "cut out a road . . . through the 80 acres in question

95

to haul logs upon"); *Roediger v. Cullen*, 175 P.2d 669, 674, 677 (Wash. 1946) (rejecting R.S. 2477 claim despite evidence of construction and repair by members of the community). For example, according to the BLM administrative decision, San Juan County route 507, in the Hart's Point area, shows signs of mechanical construction: bulldozer grouser marks, berms, pushed trees and debris, and cut banks, San Juan Admin. Det. at 11-12, Aplt. App. Vol. 1 at 255-56; and a witness testified that the road was constructed by mining companies in the 1950s, using bulldozers, for the purpose of accessing seismic lines. *Id*. at 11, 16. Yet the BLM found that "the use of this route by the public has been at most sporadic and infrequent." *Id*. 18.[36] The record indicates that the same may be true of others of the contested routes. Large parts of southern Utah are crisscrossed by old mining and logging roads constructed for a particular purpose and used for a limited period of time, but not by the general public. Thus, we cannot agree with Appellees' argument that a "mechanical construction" standard is necessary to avoid recognition of "a multitude of property claims far beyond the scope of Congress's express grant in R.S. 2477." SUWA Br. 39. The common law standard of user, which takes evidence of construction into consideration along with other evidence of use by the general public, seems better calculated to

---

[36]We make these observations regarding route 507 for purposes of illustration only, and without prejudice to the district court's factfinding on remand.

96

distinguish between rights of way genuinely accepted through continual public use over a lengthy period of time, and routes which, though mechanically constructed (at least in part), served limited purposes for limited periods of time, and never formed part of the public transportation system.

We therefore see no persuasive reason not to follow the established common law and state law interpretation of the establishment of R.S. 2477 rights of way.

### 4. Definition of "highway."

R.S. 2477 grants "the right of way for the construction of highways over public lands, not reserved for public uses." At common law the term "highway" was a broad term encompassing all sorts of rights of way for public travel. In his magisterial *Commentaries on American Law*, Chancellor James Kent wrote that "Every thoroughfare which is used by the public, and is, in the language of the English books, 'common to all the king's subjects,' is a highway, whether it be a carriage-way, a horse-way, a foot-way, or a navigable river." James Kent, 3 *Commentaries on American Law* 572-73, *432 (10th ed. 1860). *Accord*, Isaac Grant Thompson, *A Practical Treatise on the Law of Highways* 1 (1868) ("A highway is a way over which the public at large have a right of passage, whether it be a carriage way, a horse way, a foot way, or a navigable river"); Joseph K. Angell & Thomas Durfee, *A Treatise on the Law of Highways* 3-4 (2d ed. 1868)

97

("Highways are of various kinds, according to the state of civilization and wealth of the country through which they are constructed, and according to the nature and extent of the traffic to be carried on upon them, – from the rude paths of the aboriginal people, carried in direct lines over the natural surface of the country, passable only by passengers or pack-horses, to the comparatively perfect modern thoroughfare."). The Department of the Interior expressly adopted this interpretation in a decision in 1902:

> The grant of right of way by Section 2477, R. S., is not restricted to those which permit passage of broad, or of wheeled, vehicles, or yet to highways made, owned, or maintained by the public. Highways are the means of communication and of commerce. The more difficult and rugged is the country, the greater is their necessity and the more reason exists to encourage and aid their construction.

*The Pasadena and Mt. Wilson Toll Road Co. v. Schneider*, 31 Pub. Lands Dec. 405, 407-408 (1902). Under traditional interpretations, therefore, the term "highway" is congruent with and does not restrict the "continuous public use" standard: any route that satisfies the user requirement is, by definition, a "highway."

The BLM and SUWA urge us to adopt a more restrictive definition. In its administrative determinations in this case, the BLM offered the following definition of the statutory term "highways":

A highway is a thoroughfare used by the public for the passage of

98

vehicles carrying people and goods from place to place (BLM Instruction Memorandum No. UT 98-56). The claimed highway right-of-way must be public in nature and must have served as a highway when the underlying public lands were available for R.S. 2477 purposes. It is unlikely that a route used by a single entity or used only a few times would qualify as a highway, since the route must have an open public nature and uses. Similarly, a highway connects the public with identifiable destinations or places. The route should lead vehicles somewhere, but it is not required that the route connect to cities. For example, a highway can allow public access to a scenic area, a trail head, a business, or other place used by and open to the public. Routes that do not lead to an identifiable destination are unlikely to qualify.

San Juan Admin. Det. at 5, Aplt. App. Vol. 1 at 249; *see also* Garfield Admin. Det. at 5, Aplt. App. Vol. 2 at 308; Kane Admin. Det. at 5, Aplt. App. Vol. 2 at 371. The district court found this interpretation by the BLM "to be both reasonable and persuasive" and concluded that "BLM did not err in its interpretation of the term 'highways' in R.S. 2477." 147 F.Supp.2d at 1143-44.

For purposes of this case, we need not consider the broader implications of the common law definition, because this case involves exclusively claims for roads appropriate to vehicular use.[37] Moreover, there is no disagreement regarding the BLM's holding that "[t]he claimed highway right-of-way must be public in nature" and that "[i]t is unlikely that a route used by a single entity or used only a few times would qualify as a highway, since the route must have an

---

[37]The Counties stated at oral argument that they were limiting their claims to routes appropriate for vehicles.

99

open public nature and uses." That is simply a restatement of the "continuous public use" requirement of Utah law. The parties disagree, however, over whether R.S. 2477 routes are limited to roads that lead to "identifiable destinations or places."

Cases interpreting R.S. 2477, and analogous cases involving claims to public easements across private land under state law, occasionally refer to a lack of identifiable destinations as one factor bearing on the ultimate question of continuous public use. For example, in finding a valid R.S. 2477 right of way in *Lindsay Land & Live Stock Co.,* the Utah Supreme Court noted that the "road connected two points between which there was occasion for considerable public travel," 285 P. at 648, while in *Moulton v. Irish*, 218 P. at 1055, the Montana Supreme Court noted as one reason to reject an R.S. 2477 claim the fact that the road "did not lead to any town, settlement, post office, or home." *See also Dillingham Commercial Co.*, 705 P.2d at 414 ("a right of way created by public user pursuant to 43 U.S.C. § 932 connotes definite termini").

It is far from clear that this factor has much practical significance. None of the contested rights of way were rejected by the BLM solely on the basis of a lack of identifiable destinations. It is hard to imagine a road satisfying the "continuous public use" requirement that did not "lead anywhere." Moreover, given the BLM's concession that "a highway can allow public access to a scenic

100

area, a trail head, a business, or other place used by and open to the public," it is hard to imagine much of a road that would not satisfy the standard.

We therefore hold that, on remand, the district court should consider evidence regarding identifiable destinations as part of its overall determination of whether a contested route satisfies the requirements under state law for recognition as a valid R.S. 2477 claim.

### 5. *1910 Coal Withdrawal*

R.S. 2477 rights of way may be established only over lands that are "not reserved for public uses." The BLM determined that a 1910 coal withdrawal "reserved for public use" over 5.8 million acres of land in Utah, including land over which Garfield County claimed three rights of way. Garfield Admin. Det. at 9, 19, 32, and 38, Aplt. App. Vol. 2 at 312, 322, 335, and 341. It therefore invalidated those rights of way on the ground that they were not established "at a time when the lands were open for establishment of a claim under R.S. 2477." *Id.* at 32. The district court affirmed. We must decide whether the coal withdrawal constitutes a "reserv[ation] for public use" under R.S. 2477. The text of the coal withdrawal states:

> "[S]ubject to all of the provisions, limitations, exceptions, and conditions contained in [the Pickett Act and the Coal Lands Act], there is hereby withdrawn from settlement, location, sale or entry, and reserved for classification and appraisement with respect to coal values all of those certain lands of the United States . . . described as

101

follows: [describing over 5.8 million acres of land in Utah].”

### a. Why the 1910 Coal Withdrawal was not a "reservation"

It is important to note at the outset that "withdrawal" and "reservation" are not synonymous terms. Although Congress and the Supreme Court have occasionally used the terms interchangeably, *see* 1 *American Law of Mining* § 14.01 n.1 (2d ed. 2004), that does not eliminate their distinct meaning. A withdrawal makes land unavailable for certain kinds of private appropriation under the public land laws. Charles F. Wheatley, Jr., II *Study of Withdrawals and Reservations of Public Domain Lands* A-1 (1969) (report to Public Land Law Review Commission). Just as Congress, pursuant to its authority under the Property Clause, can pass laws opening the public lands to private settlement, so also it can remove the public lands from the operation of those same laws. That is what a withdrawal does. It temporarily suspends the operation of some or all of the public land laws, preserving the status quo while Congress or the executive decides on the ultimate disposition of the subject lands. *Id.*

A reservation, on the other hand, goes a step further: it not only withdraws the land from the operation of the public land laws, but also dedicates the land to a particular public use. As the first edition of Black's Law Dictionary defines it: "In public land laws of the United States, a reservation is a tract of land, more or

102

less considerable in extent, which is by public authority withdrawn from sale or settlement, and appropriated to specific public uses; such as parks, military posts, Indian lands, etc." Black's Law Dictionary 1031 (1st ed. 1891). Thus, a reservation necessarily includes a withdrawal; but it also goes a step further, effecting a dedication of the land "to specific public uses." *See also* 63C Am. Jur. 2d *Public Lands* § 31 (2005) ("Public land is withdrawn when the government withholds an area of federal land from settlement, sale, location, or entry under some or all of the general land laws in order to limit activities. . . . 'Reserved' lands have been expressly withdrawn from the public domain by statute, executive order, or treaty and dedicated as a park, military post, or Native American land or for some other specific federal use.") (footnotes omitted). The text of R.S. 2477 reinforces this point by requiring not merely that the land be "reserved," but that it be reserved "for public uses."

The text of the Coal Lands Act of 1910, subject to which President Taft issued the 1910 coal withdrawal, adheres to this distinction. The Act applied to all "[u]nreserved public lands . . . which have been withdrawn or classified as coal lands." 30 U.S.C. § 83. The use of the phrase, "unreserved public lands which have been withdrawn," indicates that lands could be "withdrawn" or classified as coal lands under the 1910 act and yet remain "unreserved."

Turning to the text of the withdrawal, we read that the subject lands were

103

"withdrawn from settlement, location, sale or entry, and reserved for classification and appraisement with respect to coal values." On its face, "withdrawn . . . and reserved" sounds like a reservation. But just because a withdrawal uses the term "reserved" does not mean that it reserves land "for public uses." We must decide whether "reserved for classification and appraisement with respect to coal values" is equivalent to "reserved for public uses."

We conclude that it is not. As noted above, land is "reserved" when it is dedicated to a specific public purpose. This is not what the coal withdrawal did. Instead, the coal withdrawal narrowly, and temporarily, removed potential coal lands from certain kinds of private appropriation. This is evident from its historical context. In the early 1900s, the nation confronted a coal shortage which coincided with the discovery of "widespread fraud in the administration of federal coal lands." *Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 868 (1999). Unscrupulous characters would obtain land under other pretenses, only to use the land for coal mining without having to pay for the real value. Due to a lack of funding, the Department of the Interior had to rely on affidavits of entrymen to determine whether lands were valuable for coal or not. This allowed railroads and other coal interests to obtain vast tracts of coal lands under railroad and agricultural grants for a nominal price. President Roosevelt "responded to the

perceived crisis by withdrawing 64 million acres of public land thought to contain coal from disposition under the public land laws." *Id.* at 869. This gave the United States an opportunity "to reexamine and reclassify lands which it thought might have exceptional value, thus preventing them from being disposed of at a price which took no account of that value." *Confederated Bands of Ute Indians v. United States*, 1948 WL 5025, *5 (Ct. Cl. 1948) (unpublished). President Roosevelt's order did not, however, reserve the withdrawn lands for a public use. As a 1924 Department of the Interior decision explained: "Temporary withdrawals made prior to . . . classification or reservation merely for the purpose of withholding the land from further disposition under the public land laws until further investigation has been made and a decision arrived at as to the character of the land and its chief value, have no effect as raising any presumption as to the character of the land, nor do they dedicate it to any special purpose or reserve it for any special form of disposal." *George G. Frandsen*, 50 Pub. Lands Dec. 516, 520 (1924).

President Roosevelt's broad withdrawal outraged homesteaders and other western interests, as even those homesteaders who had made a valid entry lost the opportunity to obtain a patent unless they could prove that the land was not valuable for coal. *Amoco Prod.*, 526 U.S. at 869. Congress thus crafted a compromise with the Coal Lands Acts of 1909 and 1910. The 1909 Act protected

105

the rights of homesteaders who had entered coal lands prior to President Roosevelt's 1906 withdrawal. It authorized the federal government to issue patents for those lands, subject to "a reservation to the United States of all coal in said lands." 30 U.S.C. § 81. The 1910 Act opened the remaining coal lands to entry under the homestead laws, subject to the same reservation of coal to the United States. *See* 30 U.S.C. § 83; *Amoco Prod.,* 526 U.S. at 870. Taken together, these acts achieved "a narrow reservation of the [coal] resource that would address the exigencies of the crisis at hand without unduly burdening the rights of homesteaders or impeding the settlement of the West." *Amoco Prod.,* 526 U.S. at 875.

Thus, not only were the lands subject to the coal withdrawal not "reserved" for any particular "public use"; they remained open to settlement, sale, and entry under several important public land laws, including the homestead laws, the desert-land law, and certain mining laws. *See* Act of June 22, 1910, ch. 318, 36 Stat. 583 (providing that "unreserved public lands . . . which have been withdrawn or classified as coal lands . . . shall be subject to appropriate entry under the homestead laws . . . [and] the desert-land law, to selection under . . . the Carey Act, and to withdrawal under . . . the Reclamation Act").[38] Because the

---

[38]President Taft issued the 1910 coal withdrawal "subject to all of the provisions, limitations, exceptions, and conditions contained in [the Pickett Act

(continued...)

lands subject to the coal withdrawal were "public lands, not reserved for public uses," they were available for establishment of rights of way under R.S. 2477.

Indeed, because R.S. 2477 provided one of the most important means of establishing access to homestead, desert-land, and mining claims, it would make little sense for Congress to open public lands to private claims but forbid settlers to construct highways to access those claims. As the BLM argued in prior litigation, in response to the argument that withdrawals under the Taylor Act in the 1930s precluded the establishment of R.S. 2477 rights of way:

> R.S. 2477 was essentially the only authority by which highways could be established across public lands by state and local governments. . . . The Congress and the Department of the Interior in the 1930's were well aware of the distinction between opening lands to possible disposition through patent as opposed to the mere creation of an easement in state and local governments. Common sense also tells us that Congress would not have intended to leave no legal means for state and local governments to acquire highways across vast areas of the west.

*Southern Utah Wilderness Alliance*, IBLA 90-375, Answer of the Bureau of Land

---

[38](...continued)
and the Coal Lands Act]." The Pickett Act limited the effect of withdrawals on certain of the mining laws, providing that withdrawals would not limit "exploration, discovery, occupation, and purchase under the mining laws of the United States, so far as the same apply to metalliferous minerals." Act of June 25, 1910, ch. 421, 36 Stat. 847, *as amended*, Act of August 24, 1912, ch. 369, 37 Stat. 497. In other words, lands withdrawn under the Pickett Act remained subject to the mining laws insofar as they applied to metalliferous minerals, such as aluminum, copper, gold, iron, lead, nickel, silver, and zinc.

Management to Additional Statement of Reasons of Appellants, at 6 (1990).

Common sense also tells us in this case that the narrow 1910 coal withdrawal, which permitted widespread settlement under the homestead, desert-land, and mining laws, was not meant to cut off the right to establish access to those claims.

### b. Humboldt County v. United States

The BLM seeks support for its position from the Ninth Circuit's decision in *Humboldt County v. United States*, 684 F.2d 1276 (9th Cir. 1982). In that case, Humboldt County asserted an R.S. 2477 right of way over land withdrawn under Executive Order No. 6910, issued in 1934, which withdrew "from settlement, location, sale or entry, and reserved for classification" all of the vacant, unreserved, and unappropriated public land in twelve western states, including Nevada (in which Humboldt County lies) and Utah. *See Executive Withdrawal Order*, 55 I.D. 205, 207 (1935). The Ninth Circuit focused its attention on what it saw as the "crucial language" in R.S. 2477: the phrase "public lands." 684 F.2d at 1281. It then reasoned syllogistically: (1) "public lands" are lands "subject to sale or other disposal under general laws"; (2) lands subject to Executive Order No. 6910 were "not subject to sale or disposition"; (3) therefore, lands subject to Executive Order 6910 were "not 'public lands.'" *Id.*

We find this argument based on *Humboldt* unpersuasive for several reasons. First, neither the BLM nor SUWA has argued that the lands subject to the 1910

108

coal withdrawal were not "public lands" for purposes of R.S. 2477. Instead, they have argued that the coal withdrawal "reserved [the lands] for public uses." *Humboldt* says nothing about whether withdrawals "reserve" land for public use; it therefore provides little, if any, support for the Appellees' position.

Moreover, even if the analysis underlying *Humboldt* were applied to lands subject to the coal withdrawal, it would not lead to the same conclusion. For, according to *Humboldt*, lands are "public" if they are "subject to sale or other disposal under general laws." *Id.* And lands covered by the coal withdrawal remained subject to sale and disposition under the homestead and desert-land laws, as well as under the metalliferous mining laws. Thus, on *Humboldt*'s own terms, lands subject to the coal withdrawal are "public lands" available for establishment of rights of way under R.S. 2477.[39]

---

[39]Because the 1910 coal withdrawal, unlike Executive Order No. 6910, left the affected lands open to settlement, the Ninth Circuit's *Humboldt* decision is distinguishable on its own terms. But there is a further complication. The Ninth Circuit appears not to have noticed that President Roosevelt issued Executive Order No. 6910 "subject to the conditions . . . expressed [in the Pickett Act]." *Executive Withdrawal Order*, 55 I.D. at 207. One of those conditions is that "all lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation, and purchase, under the mining laws of the United States, so far as the same apply to metalliferous minerals." Act of June 25, 1910, ch. 421, 36 Stat. 847, *as amended*, Act of August 24, 1912, ch. 369, 37 Stat. 497. In other words, lands withdrawn under Executive Order No. 6910 remained open to sale and disposition under the mining laws insofar as those laws applied to metalliferous minerals (minerals such as aluminum, copper, gold, iron, lead, nickel, silver, and zinc). *See also* 1 *American Law of Mining* §

(continued...)

Finally, it is worth pointing out that in prior litigation the BLM itself has rejected *Humboldt*. In a 1990 appeal before the Interior Board of Land Appeals, the BLM denounced the "convoluted argument that the public lands in the west were withdrawn from the operation of R.S. 2477 by Executive Order No. 6910." *Southern Utah Wilderness Alliance*, IBLA 90-375, Answer of the Bureau of Land Management to Additional Statement of Reasons of Appellants, at 3 (1990). It concluded that "Executive Order 6910 was in no way intended to withdraw the public lands from the operation of R.S. 2477." *Id.* at 6; *see also BLM Manual 2801 – Rights of Way Management* (stating that "Executive Order[] 6910 . . . [is] not considered to have removed public lands from unreserved status."). The BLM argued that "[t]he Department has operated in a manner inconsistent with [this] interpretation [of Executive Order No. 6910] for more than 50 years," and that such a "legalistic" interpretation of the Order "should not be adopted at this late date." *Southern Utah Wilderness Alliance*, IBLA 90-375, Answer of the Bureau of Land Management to Additional Statement of Reasons of Appellants, at 5 (1990). If our already strong reasons for rejecting *Humboldt* were not enough, we

---

[39](...continued) 14.02[1][a][iv] (2d ed. 2004) ("Since the Order [No. 6910] was based on the Pickett Act, the withdrawn lands were open to location . . . of metalliferous minerals and to mineral leasing."). Because the Ninth Circuit did not address this aspect of Executive Order No. 6910, we do not know how it squares with that Court's legal analysis of what constitutes "public lands."

110

would be loath to overturn 50 years of BLM interpretation by accepting its novel argument here.

In sum, we conclude that the 1910 coal withdrawal was not a "reservation" for purposes of R.S. 2477. The withdrawal did not dedicate the subject lands to a specific "public use," but instead left the land open to private appropriation, while withholding it from appropriation as a coal resource.

## VI. CONCLUSION

This case is REMANDED to the district court for a de novo proceeding, in accordance with this opinion. The parties shall be permitted to introduce evidence including, but not limited to, the administrative record before the BLM in making its determinations. In that proceeding, the Counties will bear the burden of proof on their R.S. 2477 claims. The district court shall determine whether the road work undertaken by the Counties in 1996 constituted a trespass, whether the Counties have a valid R.S. 2477 claim with respect to the fifteen disputed routes, and whether Kane County exceeded the scope of its right of way with respect to the Skutumpah Road.